UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


ROBERT JOHNSON, Plaintiff

vs
              CASE NO.: 4:20-cv-00410-MW-MAF

CAPTAIN A. MASSEY, et al., Defendants
_____ 1


PLAINTIFF'S RESPONSE TO THE
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT


    COMES NOW, Robert Johnson, the Plaintiff, pro se in the above-styled cause, & hereby submits this response to the Defendant's Motion for Summary Judgment, & requests that Defendant's motion be denied. As grounds Plaintiff states:

PROVIDED TO HARDEE CORRECTIONAL
INSTITUTION ON 9-27-2021 FOR MAILING
INMATE LEGAL MAIL
RG

FILED USDC FLND TL
OCT 1 '21 PM3:30

1

## BACKGROUND

.The Plaintiff, Robert Johnson, an inmate currently incarcerated at Hardee Correctional Institution in Bowling Green, Florida, commenced this pro se civil rights action pursuant to the provisions of 42 U.S.C.S. 1983 by filing a complaint in this Court. In his complaint, Plaintiff names the following Florida Department of Corrections' employees as defendants: Captain A. Massey, Sergeant A. Dowden & Officer R. Brown, all of whom were correctional officers at Franklin Correctional Institution on July 28, 2018, the date these incidents occurred.

. In his civil rights complaint, Plaintiff alleges that all of the Defendants, individually, are guilty of the following claims:

 1. First Amendment Retaliation Claim;
 2. Eighth Amendment Failure To Protect Claim;
 3. Eighth Amendment Excessive Use of Force Claim;
 4. State-Law Assault & Battery Claim; &
 5. State-Law Intentional Infliction of Emotional Distress Claim.

The basis of Plaintiff's complaint is that on July 28, 2018, sometime between the hours of 6 & 7:00 P.M., Sergeant Dowden approached Plaintiff's confinement

2

cell advising him that he would be getting a cellmate to which Plaintiff protested, advising Sergeant Dowden that he was in fear for his safety because members of security were paying & coercing inmates, presumably gang members, to threaten & attempt to kill him.

Plaintiff reiterated this fear to Captain Massey because she was the Officer-In-Charge (O.I.C). Captain Massey, along with Sergeant Dowden & officer Brown, disregarded Plaintiff's pleas & threatened to write him a disciplinary report & administer chemical agents on him if he continued refusing the cellmate.

After an unsuccessful attempt of placing the inmate in the cell with Plaintiff, Captain Massey, being video recorded via handheld camcorder by Officer Brown, advised Plaintiff to cease his disruptive behavior. Afterwards, Plaintiff submitted to hand restraints but continued reiterating his fear & continued refusing to accept a cellmate; therefore, the Defendants escorted him to a nearby holding cell.

While Plaintiff was in the holding cell, Captain Massey advised him that she was aware of a lawsuit that he filed against The Department of Risk Management & several Florida Department of Corrections' (FDOC) employees & the grievances that he filed against several DOC employees. Nearly an hour afterwards, the Defendants escorted Plaintiff back to his cell where they had placed

3

the other inmate while he was in the holding cell.

Plaintiff refused to enter the cell with the other inmate; therefore, Sergeant Dowden & Officer Brown physically assaulted & shoved him into the cell with the other inmate. Then Sergeant Dowden gave the inmate in the cell with Plaintiff a signal & the inmate attacked Plaintiff while he was still handcuffed. Afterwards, Captain Massey authorized Plaintiff to be sprayed with chemical agents for refusing to relinquish his hand restraints.

Defendants have filed their 'answer, etc.' to the 'complaint' (Doc. 21 - Massey & Brown), (Doc. 35 - Dowden) & their Motion For Summary Judgment; therefore, Plaintiff is filing this Response to the Defendant's Motion for Summary Judgment.

4

## STATEMENT OF 'DISPUTED' MATERIAL FACTS

1. Undisputed. On July 28, 2018, Defendant Audrey Massey was employed by the Florida Department of Corrections (FDOC) as a Corrections Captain at Franklin Correctional Institution. See Ex. 1 - Plaintiff's Declaration.

2. Disputed. Captain A. Massey does specifically recall this incident because of her role as co-conspirator with the other Defendants; however, she is feigning memory lapse. Id.

3. Undisputed. On July 28, 2018, in her supervisory role as Captain, she was informed that Plaintiff, Robert Johnson, was refusing to accept a cellmate. Id.

4. Undisputed. Captain Massey arrived at the cell front of cell 42-113, which housed Plaintiff. Id.

5. Disputed. To her knowledge, Sergeant Dowden threatened Plaintiff in an effort to coerce Plaintiff to accept the designated cellmate & ordered Plaintiff to submit to hand restraints, to which Plaintiff refused to comply, advising Sergeant Dowden that he was in fear for his life. Id.

6. Disputed. After Sergeant Dowden threatened to write Plaintiff a disciplinary report (DR) & have

him sprayed with chemical agents if he refused to submit to hand restraints, Plaintiff agreed to be placed in hand restraints & be removed from the cell but advised Sergeant Dowden that he was not accepting a cellmate; which is why Sergeant Dowden escorted Plaintiff out of Wing 2 to a holding cell in A dorm's entrance hallway where he was threatened & hurled insults at by the Defendants. Id.

7. Disputed. At some point, the designated cellmate was placed in Plaintiff's cell - A2-113 - while Plaintiff was in the holding cell. Id.

8. Disputed. Approximately an hour after placing Plaintiff in the holding cell, Defendants Dowden & Brown escorted Plaintiff back to cell A2-113 where they had placed the other inmate; however, after Plaintiff saw the other inmate in the cell, he refused to enter the cell advising the Defendants that he was in fear for his life. Defendants Dowden & Brown began assaulting Plaintiff & shoved him into the cell; whereas, Plaintiff refused to relinquish his hand restraints advising them that he was in fear for his life. Id.

9. Disputed. Correctional staff did not approach the cell several times to retrieve the hand restraints from Plaintiff. Id.

10. Disputed. When Captain Massey gave Plaintiff a final order, it was to cease his disruptive behavior, not to counsel with him about being in fear for his life nor did she ask him to relinquish his hand restraints. Id.

11. Undisputed. She then directed officer Dana Keith to administer a burst of chemical agent CS spray in the cell. Id.

12. Disputed. At that time, Plaintiff was never issued an order. Id.

13. Undisputed. Plaintiff received clean clothing & a post use of force physical examination & was secured in a decontaminated cell. Id.

14. Disputed. Captain Massey personally used physical force on him by authorizing it. There was no need for the Defendants physical force. Id.

15. Disputed. While Plaintiff was in the holding cell, Captain Massey threatened Plaintiff & observed Sergeant Dowden threaten Plaintiff. Id.

16. Disputed. Captain Massey verbally threatened & retaliated upon Plaintiff for him writing several grievances on her coworkers & for filing a lawsuit against other FDOC employees at another institution. Id.

7

17. Undisputed. On July 28, 2018, Sergeant Dowden was employed at Franklin Correctional Institution. Id.

18. Disputed. Sergeant Dowden does specifically recall this incident because of his role as coconspirator with the other Defendants; however, he is feigning memory lapse. Id.

19. Undisputed. On that date, Sergeant Dowden was assigned as a dorm supervisor. Id.

20. Disputed. After Sergeant Dowden gave Plaintiff the first order to submit to hand restraints because he was getting a cellmate, Plaintiff did not comply because he advised Sergeant Dowden that he was not accepting a cellmate because members of security were paying inmates to attack him; therefore, he was in fear for his life. Id.

21. Disputed. Sergeant Dowden gave Plaintiff several more orders to submit to hand restraints to which Plaintiff failed to comply, furtherly pleading that he was in fear for his life. After Sergeant Dowden threatened to write Plaintiff a DR & have him sprayed with chemical agents if he continued refusing to submit to hand restraints, Plaintiff finally agreed to submit to hand restraints but advised Sergeant Dowden that he was not accepting a cellmate. Id.

8

22. Disputed. After the Defendants removed Plaintiff from his cell & locked him in the holding cell for over an hour, Defendants Dowden & Brown escorted him back to his cell where he discovered that they had put the other inmate in his cell; therefore, he refused to enter the cell; advising the Defendants that he was in fear for his life. After the Defendants disregarded Plaintiff's pleas & forcefully forced him into the cell with the other inmate, Plaintiff refused to relinquish his hand restraints requesting to be housed alone due to him being in fear for his life. Id.

23. Disputed. Sergeant Dowden personally used excessive force on Plaintiff by bending his wrists & arm in painful positions, threatening to slam him on his face & forcefully shoving him into the cell with the other inmate despite his pleas for protection. Id.

24. Undisputed. Sergeant Dowden did write Plaintiff a DR for disobeying a verbal order & plaintiff was found guilty. See Defendants Ex. B & G.

25. Disputed. Sergeant Dowden threatened Plaintiff while he was in the holding cell & he observed Captain Massey threaten Plaintiff as well. Additionally, Officer Brown assisted

Sergeant Dowden in assaulting Plaintiff & forcefully shoving Plaintiff into the cell with the other inmate. Id.

26. Undisputed. On July 28, 2018, Officer Brown was employed at Franklin Correctional Institution. Id.

27. Disputed. Officer Brown does specifically recall this incident because of his role as coconspirator with the other Defendants; however, he is feigning memory lapse. Id.

28. Undisputed. On July 28, 2018, Officer Brown operated the handheld camcorder & recorded the application of chemical agents upon Plaintiff. Id.

29. Undisputed. By operating the camcorder, Officer Brown observed the application of chemical agents upon Plaintiff as reflected in the 'Report of Force Used'. Id

30. Disputed. Upon forcing Plaintiff into the cell with the other inmate, Officer Brown assisted Sergeant Dowden with bending Plaintiff's wrists & arms in painful positions & forcefully shoving Plaintiff into the cell, thereby, using excessive physical force on Plaintiff. Id.

31. Disputed. Plaintiff did not report any physical injuries during the subject incident.

<u>MEMORANDUM OF LAW AND FACTS</u>
<u>IN SUPPORT OF PLAINTIFF'S</u>
<u>RESPONSE TO DEFENDANT'S MOTION</u>
<u>FOR SUMMARY JUDGMENT</u>

## 1. <u>SUMMARY JUDGMENT STANDARD</u>

"The court shall grant summary judgment if the movant <u>shows</u> that there is no genuine dispute as to any material fact & the movant is entitled to judgment as a matter of law." <u>Fed. R. Civ. P. 56 (a)</u>. However, "when the non-moving party proves that there remain genuine issues of material fact with respect to his claims against the Defendants that prevent entry of summary judgment, the Defendant's Motion for Summary Judgment is due to be denied." See <u>Wesley v. Brown</u>, 2017 U.S. Dist. LEXIS 5109, Case No. 3:14-cv-180-J-34MCR (January 12, 2017).

A genuine dispute is present if a reasonable jury could return a verdict in favor of the non-moving party. <u>Allen v. Bd. of Public Educ. for Bibb Cnty.</u>, 495 F.3d 1306, 1313 (11th Cir. 1995). It is only when the moving party meets its initial burden does the burden shift to the non-moving party to

demonstrate there are "specific facts showing that there is a genuine issue for trial." *Jeffrey v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995) "At the summary judgment stage, the Court assumes all facts in the light most favorable to Plaintiff, as the non-moving party, & draws all inferences in Plaintiff's favor." *McKinney v. Newlin*, 520 F. App'x 903, 905 (11th Cir. 2013). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986).

"Moreover, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed. 2d 686 (2007). In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by depositions, documents, affidavits, interrogatory answers, or other materials that specific facts exist demonstrating a genuine issue for trial. *Celetex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986).

"A pro se plaintiff's complaint, however, if verified under 28 U.S.C.S. 1746, is equivalent to an affidavit, & thus may be viewed as evidence." Murrell v. Bennett, 615 F.2d 306, 310 n.5 (5th Cir. 1980). "Nevertheless, an affidavit or declaration used to support or oppose a motion must be made on personal knowledge." Fed. R. Civ. P. 56(c)(4).

"Affidavits based, in part, upon information & belief, rather than personal knowledge, are insufficient to withstand a motion for summary judgment." Ellis v England, 432 F.3d 1321, 1327 (11th Cir. 2005). "The substantive law control which facts are material & which are irrelevant." Raney v. Vinson Guard Service, Inc., 120 F.3d 1192, 1196 (11th Cir. 1997).

"If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Hetchkop v. Woodlawn at Grassmere, Inc., 116 F.3d 28, 33 (2d Cir. 1997)

II. <u>ALL DEFENDANTS ARE LIABLE FOR</u>
<u>FIRST AMENDMENT RETALIATION CLAIM</u>

In <u>Count 1</u> of his civil rights complaint, Plaintiff <u>alleges</u> that Defendants Massey, Dowden & Brown, then correctional officers at Franklin Correctional Institution, violated his right under the First Amendment to the United States Constitution by retaliating upon him for filing a lawsuit against DOC employees, filing grievances on DOC employees & for requesting protection against DOC employees & inmates wanting to harm him.

"A prisoner who is claiming that a defendant retaliated against him for exercising his constitutional rights must prove that: (1) his conduct was constitutionally protected; (2) he suffered "Adverse Action" at the hands of the defendant; & (3) his constitutionally protected conduct was a substantial or motivating factor in the decision of the defendant," Hudson v. Palmer, <u>468 U.S. 517</u>, 526-27, 104 S.Ct. 3194, 3200-01, <u>82 L.Ed. 2d 393</u> (1984)

<u>A. CONSTITUTIONALLY PROTECTED ACTIVITY</u>

The Defendants have not disputed whether Plaintiff engaged in constitutionally protected activity

14

when he filed grievances against their coworkers - See Ex. 2 -, a lawsuit against The Department of Risk Management & DOC employees at another institution - See Ex. 3 - & requesting protection against DOC employees & inmates that were trying to harm him- See Ex. 4, & for good reason.

The filing of a lawsuit has been deemed constitutionally protected activity under the First Amendment. See Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003) (finding that the prisoner's allegation, that he was falsely charged with misconduct in retaliation for filing complaints against a correctional officer, implicates conduct protected by the First Amendment.); Mearin v. Vidonish, 450 F. App'x 100, 102 (3d Cir. 2011) (stating in the context of a First Amendment retaliation claim that "the filing of grievances & lawsuits against prison officials constitutes constitutionally protected activity."); Whitney v. Wetzel, 649 F. App'x 123, 126 (3d Cir. 2016) ("A prisoner's ability to file grievances & lawsuits against prison officials is a constitutionally protected activity for purposes of a First Amendment retaliation claim.")

The Defendants have disputed, however, whether Plaintiff suffered adverse action at their hands & whether such action was motivated by him filing grievances & a lawsuit against their coworkers, see Defendant's Statement of Material Undisputed Facts- pg 4, line 16.

## B.   ADVERSE   ACTION

An adverse action is one that is sufficient to deter a person of ordinary firmness from exercising his or her constitutional rights. Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001)

On July 28, 2018, After Plaintiff refused to accept a cellmate advising all of the Defendants that members of security were paying & coercing inmates to threaten & attempt to kill him; therefore, he was in fear for his life & could not consent to accepting a cellmate, the Defendants placed Plaintiff in hand restraints & took him out of the confinement wing (where there was audio recording) & put him in a holding cell, where there was no audio recording. See First Video of A2 at 19:31.

Once the Defendants were free of audio recording, they began hurling insults at & threatening Plaintiff. Defendant Massey began by informing Plaintiff that she was aware of the lawsuit that he filed against the Department of Risk Management & Corrections' Officers at Calhoun Correctional Institution & that she was also aware of the numerous grievances that he had written on several staff members. See First Holding Cell Video At 19:32 - 19:38.

16

Then she threatened that she didn't give a damn if Plaintiff was in confinement or on the compound, they were going to get him one way or another because he was in their world & there was nothing that he could do about it. Immediately afterwards, Defendant Dowden advised Plaintiff that they had paid the designated cellmate to fuck Plaintiff up & that Plaintiff was going in the cell with the inmate one way or another. Following this threat, Defendant Massey advised Plaintiff that he could write that up if he wanted to, referring to Plaintiff's habitual grievance writing. See Ex. 1 - Declaration of Robert Johnson, pg. 4, lines 17 & 18.

Although mere threats do not amount to an adverse action for purposes of a First Amendment retaliation claim, excessive use of force after a threat does. See Mobley v. Barnacle, 2018 U.S. Dist. LEXIS 26803, CIVIL NO. 1-14-CV-00615 (February 16, 2018)

Therefore, the Defendants attempted to deter Plaintiff from filing future grievances & lawsuits against DOC employees by forcing him into the cell with another inmate to be assaulted while he was in hand restraints, then administering chemical agents on him for refusing to accept a cellmate. See Ex. 1 - Declaration of Robert Johnson, pg. 8, line 39.

In response, the Defendants deny threatening & retaliating upon Plaintiff. See Defendants' Motion for Summary Judgment - Ex. A - lines 16 & 17. Instead, the Defendants generally argue that chemical agents were administered on Plaintiff because he refused to relinquish his hand restraints; however, they all admitted that Plaintiff advised them that he was in fear for his life & did not want to be housed in the cell with the designated inmate. See Defendants' Motion For Summary Judgment - pg. 2, paragraphs 1 & 2.

As such, the Eighth Amendment of the United States Constitution imposes a duty on prison officials to protect prisoners from violence at the hands of other prisoners. See Rodriguez v. Sec. of DOC, 508 F.3d 611 (11th Cir. 2007) Therefore, the Defendants violated the Eighth Amendment by disregarding Plaintiff's pleas for protection & as the result thereof, Plaintiff had a legal right to stand for what was right, even if it included refusing to relinquish his hand restraints & requesting to be removed from the cell with the other inmate.

Additionally, "use of chemical agents such as tear gas & mace by prison officials to subdue individual prisoners, rather than to quell large disturbances, should be more restricted. The use of tear gas in small amounts may

be a necessary prison technique if a prisoner refuses, after adequate warning, to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required. The USE OF SUCH AGENTS SHOULD BE STRICTLY LIMITED TO CIRCUMSTANCES PRESENTING THE UTMOST DEGREE OF DANGER AND LOSS OF CONTROL..." See Lock v. Jenkins, 641 F.2d 488 (7th Cir. 1981)

A prisoner claiming to be in fear for his life & requesting to be moved out of a cell with another inmate that imposes a threat to him is not a rare circumstance where chemical agents would be appropriate. See Stringer v. Rowe, 616 F.2d 993 (7th Cir. 1980) Therefore, the Defendants's tactic of attempting to justify its unwarranted force & retaliation upon Plaintiff has not been justified & results in Adverse Action.

## C. CAUSAL CONNECTION

In the context of a retaliation claim, a plaintiff must prove that the constitutionally protected activity he engaged in was a substantial or motivating factor in the defendants' decision to take adverse action against the

plaintiff. See Rauser, 241 F.3d at 333.

Defendant Massey's acknowledgment of Plaintiff's lawsuit & grievances while he was confined in the holding cell causally linked the Defendant's adverse actions to Plaintiff's constitutionally protected activity. The Defendants had no need to remove Plaintiff from his cell & confine him in a holding cell if he willingly accepted a cellmate as alleged by the Defendants in their Motion for Summary Judgment. See Defendant's Statement of Material Undisputed Facts - pg. 3, lines 5-8.

On the contrary, the Defendants escorted Plaintiff out of Wing 2 & put him in a holding cell because there were things that they wanted to tell him off audio recording. Then, it was their malicious intent to force Plaintiff in the cell with the other inmate, which is why they entirely disregarded his pleas of being in fear for his life. See Ex. 1

The Defendants' story is blatantly contradicted by the record so that no reasonable jury could believe it; therefore, this Court should not adopt that version of the facts for purposes of ruling on the Defendant's Motion for Summary Judgment. See Scott, 550 U.S. at 380.

20

Whereas, Plaintiff has adequately opposed the Defendants' Motion for Summary Judgment in regards to his First Amendment retaliation claim & truly believe that specific facts exist demonstrating a genuine issue for trial. See Celetex Corp., 477 U.S. At 324.


## III. ALL DEFENDANTS ARE LIABLE FOR EIGHTH AMENDMENT FAILURE TO PROTECT CLAIM


In Count 2 of his civil rights complaint, Plaintiff alleges that Defendants Massey, Dowden & Brown violated his rights under the Eighth Amendment to the United States Constitution by forcing him into a cell with another inmate after he advised them that he was in fear for his life; thereby, failing to protect him from harm.

"The Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners'," Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed. 2d 811 (1994)(citing various courts of appeals); see Zatler v. Wainwright, 802 F.2d 397, 400 (11th Cir. 1986)("It is well settled that a prison inmate has a constitutional right to be protected ... from physical assault by other inmates.") "Having stripped prisoners of virtually every means of self-protection & foreclosed their access to outside aid, the

21

government & its officials are not free to let the state of nature take its course." Farmer, 511 U.S. at 833, 114 S.Ct. at 1977.

A prison official violates the Eighth Amendment when he actually (subjectively) knows that an inmate is facing a substantial risk of serious harm, yet disregards that known risk by failing to respond to it in an (objectively) reasonable manner. See Farmer, 511 U.S. at 829, 837, 844, 114 S.Ct. at 1974, 1979, 1982-83; see also Cottone v. Jenne, 326 F.3d 1352, 1358 (11th Cir. 2003); Hale v. Tallapoosa County, 50 F.3d 1579, 1582-83 (11th Cir. 1995)

As with any other claim brought under 1983, to succeed, the inmate must demonstrate a causal connection between the prison official's conduct & the Eighth Amendment violation. See Williams v. Bennett, 689 F.2d 1370, 1380 (11th Cir. 1982); see also LaMarca v. Turner, 995 F.2d 1526 (11th Cir 1993)

With regard to the subjective component of the Eighth Amendment claim, the Court in Farmer held that the prison "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, & he must also draw the inference". 511 U.S. at 837, 114 S.Ct. at 1979.

The Court also held: "Whether a prison official had requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." Id, at 842, 114 S.Ct. at 1981 (emphasis added).

22

A prison official cannot avoid liability under the Eighth Amendment "by showing that... he did not know the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault". Id at 843, 114 S.Ct. at 1982.

This is because "the question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a substantial 'risk of serious damage to his future health'", Id, (quoting Helling v. McKinney, 509 U.S. 25, 35, 113 S.Ct. 2475, 2481, 125 L.Ed. 2d 22 (1993)).

On July 4, 2018, Plaintiff was placed in administrative confinement pending disciplinary charges. See Ex. 5. On this same date, Plaintiff also requested protective management, advising prison officials at Franklin Correctional Institution that staff members had paid several inmates of different nationalities to threaten & attempt to kill him. See Ex. 6. A week later, Plaintiff was convicted on the disciplinary charges & sentenced to 30 days disciplinary confinement. See Ex. 7. Therefore, on July 28, 2018, the date of the incident, Plaintiff's confinement status was disciplinary confinement pending protective management (DC/PM).

On July 28, 2018, the Defendants attempted to force Plaintiff to accept a cellmate after Plaintiff advised all of the Defendants that he was in fear for his life. The Defendants even went as far as removing Plaintiff from his confinement cell & putting him in a holding cell, then putting the other inmate

in his cell & shoving Plaintiff into the cell with the designated cellmate, despite Plaintiff's pleas of fear.

While he was in the holding cell, the Defendants threatened Plaintiff that they had hired the designated cellmate to fuck Plaintiff up & he was going in the cell with the designated cellmate no matter what. So when the Defendants did force Plaintiff into the cell with the designated cellmate, Plaintiff was attacked by him. See Ex. 1 - Plaintiff's Declaration.

Therefore, each Defendant breached their duty to protect Plaintiff from violence at the hands of the designated cellmate because they not only knew, they hired the cellmate to harm Plaintiff. <u>See Farmer</u>, <u>511 U.S. at 829</u>. Despite Plaintiff's pleas for protection, the Defendants failed to respond in an (objectively) reasonable manner. Id.

Plaintiff advised the Defendants that he was in fear of that specific inmate & refused to be housed in the cell with him; therefore, the Defendants acted with deliberate indifference, exposing Plaintiff to a substantial risk of serious damage to his future health. Id.

In response, the Defendants allege that Plaintiff willfully accepted his designated cellmate because, eventually, he submitted to hand restraints. See the Defendants' Statement of Material Undisputed Facts, pg. 3, lines 5-7. The Defendants' response is false, Plaintiff submitted to hand restraints to avoid a disciplinary report & the application of chemical agents. See Ex. 1 ; & the First handheld camcorder video,

24

During Discovery, the Defendants did not furnish Plaintiff the portion of the video of A dorm Wing 2, in which, he was removed from the holding cell & forced into the cell with the designated cellmate, & for good reason. However, the Defendants did admit that Plaintiff advised each of them that he was in fear for his life. See Defendants' Statement of Material Undisputed Facts, pg. 3, lines 3-5

The Defendants' story is blatantly contradicted by the record so that no reasonable jury could believe it; therefore this Court should not adopt that version of the facts for purposes of ruling on the Defendants' Motion for Summary Judgment. See Scott, 550 U.S. at 380.

Whereas, Plaintiff has adequately opposed the Defendants' Motion for Summary Judgment in regards to his Eighth Amendment Failure to Protect claim & truly believe that specific facts exist demonstrating a genuine issue for trial. See Celetex Corp., 477 U.S. at 324.

## IV. ALL DEFENDANTS ARE LIABLE FOR EIGHTH AMENDMENT EXCESSIVE USE OF FORCE CLAIM

In an Eighth Amendment excessive use of force claim, the core inquiry is "whether force was applied in a good-faith effort to maintain or

restore discipline, or maliciously & sadistically to cause harm". Hudson v. McMillian, 503 U.S. 1, 112 S.Ct. 995, 999, 117 L. Ed. 2d 156 (1992).

In determining whether force was applied maliciously & sadistically, the Court look to five factors: (1) the extent of the injury; (2) the need for application of force; (3) the relationship between that need & the amount of force used; (4) any efforts made to temper the severity of a forceful response; & (5) the extent of the threat to the safety of staff & inmates (as reasonably perceived by the responsible officials on the basis of facts known to them..." Campbell v. Sikes, 169 F.3d 1353, 1357 (11th Cir. 1999).

However, the Eighth Amendment's prohibition of cruel & unusual punishment necessarily excludes from constitutional recognition _de minimus_ uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind. Hudson, 112 S.Ct. at 1000 (quotations omitted); McKinney, 520 F. App'x at 905; Howard v. Memmon, 572 F. App'x 692, 695 (11th Cir. 2014) ("Courts examine the facts as reasonably perceived by the defendants on the basis of the facts known to them at the time.")

On the date of the incident, Plaintiff was in confinement serving a thirty (30) day DC sentence. He was also pending PM. when the Defendants attempted to put an inmate in the cell with him. After Plaintiff pleaded his fear of accepting a cellmate to the Defendants, they removed him from his cell, put the other inmate in his cell, then shoved Plaintiff in the

cell with the other inmate; therefore, Plaintiff refused to relinquish his hand restraints requesting to be removed from the cell with the inmate. In response to Plaintiff refusing to relinquish his hand restraints, the Defendants administered chemical agents on him. See Ex. 1 - Plaintiff's Declaration

In its Motion for Summary Judgment, the Defendants allege that initially Plaintiff refused to accept the designated cellmate but after several orders to submit to hand restraints, he complied & willfully accepted the cellmate. Then once the inmates were in the cell together, Plaintiff, all of a sudden, refused to relinquish his hand restraints; thereby, warranting the application of chemical agents. See Defendants' statement of Material Undisputed Facts, pgs. 3-4, lines 1-11.

Although the Defendants allege that they applied force in good faith, the evidence surrounding the incident proves otherwise. Applying the five (5) factors that the Court utilizes to determine whether the force was applied maliciously & sadistically, it is obvious that the Defendants crossed the constitutional line.

## FACTOR #1: EXTENT OF THE INJURY

The Defendants inflicted unnecessary & wanton pain & suffering upon Plaintiff by administering a whole can of Orthochlorobenzal Malononitrile into his confinement cell, striking him in the head &

27

upper torso area. See Ex. A of Defendants' Motion for Summary Judgment/Declaration of Audrey Massey, pg. 2 line 12; see also Second Handheld Camcorder video at 01.57

The chemical agent caused Plaintiff to inhale carbon monoxide into his respiratory system; thereby, hindering his ability to breathe. It also caused him to feel a burning sensation of the eyes & skin, which caused tearing of the eyes, loss of eyesight, nasal discharge, & skin irritation for weeks. See Ex. 8.

FACTOR # 2: NEED FOR APPLICATION OF FORCE

There was entirely no need for the Defendants' to administer chemical agents on Plaintiff; his hands were cuffed behind his back, he was not threatening the Defendants or the cellmate, he had just been assaulted by the cellmate & was requesting to be removed from the cell because he was in fear for his life.

Per Rule 33-602.210(2)(a)6 of the Florida Administrative Code (F.A.C.), "Department staff... are authorized to apply force on an inmate ONLY WHEN THEY REASONABLY BELIEVE IT TO BE NECESSARY to overcome an inmate's physical resistance to a lawful command. See Ex. 8.

To determine whether the Defendant's use of force was reasonably necessary, we would have to get to the gist of why Plaintiff resisted the

28

Defendant's lawful command. According to the institutional policy, there are 2 steps that must be taken prior to placing inmates in confinement in the same cell.

First is Rule 33-602.221(3)(a), F.A.C., which states, "Prior to placing inmates in the same cell, a determination shall be made by the housing supervisor that none of the inmates constitute a threat to any of the others, & document such on Form DC6-235, Record of Protective Management." Ex. 9.

Whether the Defendants documented such on Form DC6-235 is uncertain because Plaintiff was not furnished a copy during discovery. However, Plaintiff do have evidence that he & the other inmate was not compatible. Whereas Plaintiff was on DC status, the other inmate had just been escorted to confinement from general population; therefore, the other inmate was Administrative Confinement (AC) status. This fact is known to Plaintiff because the designated cellmate had not been issued a bedroll yet, nor did he have any personal property when the Defendants attempted to put him in the cell with Plaintiff. See ~~video A/V1 0237~~ First video of AZ at 19:24.

Per Rule 33-602.222(2)(b), F.A.C., "Disciplinary Confinement (DC) cells shall be physically seperate from other confinement statuses whenever possible. Whenever such location is not possible, physical barriers shall preclude the cross association of those in DC with those in other housing statuses." See Ex. 10

The second step to placing inmates in the same cell together is Rule 33-602.222(3)(a),

F.A.C., which states, "Prior to placing inmates in the same cell, the INMATES SHALL BE REVIEWED BY THE HOUSING SUPERVISOR to ensure that none of the inmates constitute a threat to any of the others." See Ex. 1D.

Neither of these steps were taken by the Defendants. The designated cellmate was not compatible with Plaintiff, as alleged by the Defendants, nor did they interview Plaintiff to ensure that he did not pose a threat to the designated cellmate or vice versa. Therefore, Plaintiff's refusal to relinquish the hand restraints was a good-faith attempt to confer with the Defendants so that the institutional policy & his constitutional rights could have been honored.

FACTOR #3: THE RELATIONSHIP BETWEEN THAT NEED AND THE AMOUNT OF FORCE USED

The Defendants allege that they reasonably believed it to be necessary to spray a whole can of Orthochlorobenzal Malononitrile (CS) on Plaintiff to force him to relinquish his hand restraints & accept the designated cellmate. However, after the application of the chemical agent, the Defendants totally contradicted the need for force because Plaintiff & the other inmate were removed from the cell & when Plaintiff returned to the cell, he was housed alone while the other inmate was housed

in another cell. See A2 wing Camera 3 at 22:00.

Therefore, had the Defendants properly exercised Rule 33-602.210(2)(b), F.A.C., & pursued other means before using force, Plaintiff could have remained housed alone & they could have housed the other inmate in another cell. Instead, the Defendants chose to disregard the institutional policy & apply force on Plaintiff maliciously & sadistically for the very purpose of causing harm.

Prior to administering chemical agents on Plaintiff, the Defendants violated the institutional policy & Plaintiff's constitutional rights by forcing him to live in fear; therefore, it would be constitutionally impermissible to conclude that the Defendants applied force on Plaintiff in a good-faith attempt to maintain or restore discipline. See Stringer v. Rowe, 616 F. 2d 993 (7th Cir, 1980)

Being that there was no need to spray a whole can of CS on Plaintiff for being in fear for his life, the relationship between the need for force & the amount of force used amounts to Cruel & Unusual Punishment. A whole can of CS spray on an inmate that poses no risk is not a de minimus use of force, but instead, is constitutionally impermissible. See McCargo v. Mister, 462 F. Supp. 813,819 (D. Md. 1978)

31

FACTOR #4: ANY EFFORTS MADE TO
TEMPER THE SEVERITY OF A
FORCEFUL RESPONSE

The Defendants did not even consider any effort to temper the severity of a forceful response. After Plaintiff refused to relinquish his hand restraints, a minute or two later the Defendants arrived & administered chemical agents on him. See Second Handheld Camera video at 2:20.

FACTOR #5: THE EXTENT OF THE
THREAT TO THE SAFETY OF STAFF
AND INMATES

Plaintiff was handcuffed behind his back pleading for protection, he did not pose a threat to anyone. See Second Handheld Camera at 2:20.

Where as, Plaintiff has adequately opposed the Defendants' Motion for Summary Judgment in regards to his Eighth Amendment Excessive Use of Force claim & truly believe that specific facts exist demonstrating a genuine issue for trial. See Celetex Corp., 477 U.S. at 324.

## IV. ALL DEFENDANTS ARE LIABLE FOR STATE-LAW ASSAULT AND BATTERY CLAIM

In order to establish a claim for battery, a Plaintiff must prove that the defendant intended to cause imminent harmful or offensive bodily contact with the plaintiff & that such contact actually followed. See Cooper v. Lankenau Hosp., 616 Pa. 550, 51 A. 3d 183, 191 (Pa. 2012)

In order to establish a claim for assault, a plaintiff must prove that the defendant intended to cause the plaintiff apprehension of imminent harmful or offensive bodily contact (i.e., battery) & that such apprehension actually occurred. See D'Errico v. DeFazio, 2000 Pa. Super 354, 763 A. 2d 424, 431 n. 2 (Pa. Super Ct. 2000)

A plaintiff is not required to show actual physical injury to establish a battery. See Brownstein v. Geida, 649 F. Supp. 2d 368, 375 (M.D. Pa. 2009)

In count IV of his civil rights complaint, Plaintiff alleges that all Defendants violated his state-law rights by bending his arm & wrists in painful positions & shoving him into his cell, thereby, assaulting & battering him.

After Defendants Dowden & Brown - Acting under the authorization of Defendant Massey's order - took Plaintiff out of the holding cell & escorted him back

to cell 42-113, the Defendants intentionally made harmful & offensive contact with Plaintiff. The facts are as follows:

After Defendants Dowden & Brown took Plaintiff out of the holding cell & escorted him back to his cell, Plaintiff noticed that they had put the designated cellmate in his cell; therefore, Plaintiff refused to enter the cell with the other inmate advising the Defendants that he was in fear for his life.

Defendant Dowden ordered Plaintiff to stop resisting entering the cell before he slam Plaintiff on the floor. Once Plaintiff kept refusing to enter the cell, Defendant Dowden grabbed Plaintiff's left arm & wrists & bent them upwards causing Plaintiff to bend forward while Defendant Brown tightly gripped Plaintiff's right arm & together they forcefully shoved Plaintiff into the cell & slammed the door afterwards. See Ex. 1 - Plaintiff's Declaration, pgs. 5-6, lines 23-31, (The Defendants did not include the audio & video recordings of this particular incident in their discovery).

Defendants Dowden's & Brown's act of bending Plaintiff's arms & wrists upwards & shoving him into the cell constitutes assault & battery. An assault has been described as an act intended to put another in reasonable apprehension of an immediate battery, which succeeds in causing an apprehension of such a battery. See D'Errico, 2000 Pa. Super at 354 (citing Cucinotti v. Ortmann, 399 Pa. 26, 159 A.2d 216, 217 (1960)).

On the other hand, a battery has been

34

defined as 'unconsented touching that is either harm-
ful or offensive', See Cooper, 616 Pa.ᵃᵗ550.

      In response, the Defendants allege that they
never used force on Plaintiff; however, they never alleged
how Plaintiff got inside of the cell with the cellmate.

      In general, the Defendants' story is blatantly
contradicted by the record so that no reasonable
jury could believe it; therefore, this court should not
adopt that version of the facts for purposes of
ruling on the Defendants' Motion for Summary
Judgment. See Scott, 550 U.S. at 380.

      Whereas, Plaintiff has adequately opposed the
Defendants' Motion for Summary Judgment in regards
to his state-law assault & battery claim & truly
believe that specific facts exist demonstrating a
genuine issue for trial. See Celetex Corp., 477 U.S.
at 324.


## V. ALL DEFENDANTS ARE LIABLE FOR STATE-LAW INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM


      In Count V of his civil rights complaint,
Plaintiff alleges that all Defendants violated his
state-law rights by intentionally inflicting emotional
distress upon him by violating the institutional
policy & his constitutional rights.

Under Florida law, a claim for intentional infliction of emotional distress has four elements: (1) deliberate or reckless infliction of mental suffering, (2) outrageous conduct, (3) the conduct caused the emotional distress, & (4) the emotional distress was severe. _Thomas v. Hosp. Bd. of Dirs. of Lee Cnty_, 41 So.3d 246, 256 (Fla. 2d Dist. Ct. App. 2010)

To demonstrate that the defendant's infliction of mental suffering was deliberate or reckless, the plaintiff must show that the defendant's conduct was directed at the plaintiff. _See Baker v. Fitzgerald_, 513 So.2d 873 (Fla. 3d Dist. Ct. App. 1990); _Habelow v. Travelers Ins. Co._, 389 So. 2d 218, 220 (Fla. 5th Dist. Ct. App. 1980)

To demonstrate that the defendant engaged in outrageous conduct, the plaintiff must show that the defendant's actions were "so outrageous in character, & so extreme in degree, as to go beyond all possible bounds of decency, & to be regarded as atrocious, & utterly intolerable in a civilized community". _Metro Life Ins. Co. v McCarson_, 467 So.2d 277, 278-79 (Fla. 1985) (quoting _Restatement (Second) of Torts_ 46 (1965)). In evaluating whether conduct reaches this level, the court must make an objective determination, & the subjective response of the person suffering emotional distress does not control. _Liberty Mut. Ins. Co. v. Steadman_, 968 So.2d 592, 595 (Fla. 2d Dist. Ct. App. 2007)

Moreover, whether conduct is outrageous enough to support a claim of intentional infliction of emotional distress, is a question of law. _Id._

36

## 1. DELIBERATE   OR   RECKLESS   INFLICTION
## OF   MENTAL   SUFFERING

The Defendants deliberately & recklessly inflicted stress, fear & depression upon Plaintiff by threatening, assaulting, paying inmates to threaten & assault him, & administering chemical agents on him. Ex. 1 - Plaintiff's Declaration, It is undisputable whether the Defendants' conduct was directed at Plaintiff.

## 2.   OUTRAGEOUS   CONDUCT

The Defendants' conduct was so outrageous, that it violated the First & Eighth Amendments to the United States Constitution, state-law & the provisions of the Florida Administrative Code. The Defendants' conduct is utterly intolerable in a civilized community. See Metro Life Ins. Co., 467 So.2d At 278-79.

37

### 3. THE CONDUCT CAUSED THE EMOTIONAL DISTRESS

.The Defendants' conduct led to Plaintiff submitting several DC6-236 Inmate Request Forms to the institution's psychologist seeking psychotherapy due to him being emotionally distressed. See Ex. 11 . Prior to the Defendants' outrageous conduct, Plaintiff had never requested to be seen by the institution's psychologist; therefore, it is right to say that the Defendants' outrageous conduct caused Plaintiff's emotional distress.

### 4 THE EMOTIONAL DISTRESS WAS SEVERE

.Plaintiff's emotional distress was so severe that he sought psychotherapy multiple times after the incident. See Ex. 12 Plaintiff never received inpatient treatment; therefore, he is unable to provide this Court

38

with competent medical evidence, such as a doctor or an expert report, to show that he actually suffered distress

On each visit to the institution's psychologist, the psychologist classified Plaintiff's distress as security concerns & referred Plaintiff to speak to security. See Ex. 13.

Whereas, Plaintiff has adequately satisfied all four elements of an Intentional Infliction of Emotional Distress claim.

In response, the Defendants argue that Plaintiff is not entitled to receive compensatory damages, as he sustained no physical injuries. See Defendants' Motion for Summary Judgment, pg. 11 Section III. Although Plaintiff did not seek compensatory damages as part of his 'relief sought', Plaintiff did sustain a physical injury that was not reported to the nurse during the post use of force medical examination.

Under 42 U.S.C.S. 1997 e(e), "A physical injury is an observable or diagnosable medical condition requiring treatment by a medical care professional..." See Pierce v. County of Orange, 526 F.3d 1190, 1224 (9th Cir. 2008)

Although Section 1997 e(e) does not specifically clarify physical injuries, several federal courts have used the broad interpretation of the language of federal criminal statutes that uses the phrase 'bodily injury',

which is the same as 'physical injury' under the PLRA. They define 'bodily injury' as meaning: "(A) a cut, abrasion, bruise, burn, or disfigurement; (B) physical pain; (C) illness; (D) impairment of a function of a bodily member, organ or mental faculty; or (E) any other injury to the body, no matter how temporary. See 18 U.S.C.S.'s 242; 831(f)(5); 1365(g)(4); 1515(a)(5); & 1864(d)(2).

 "When Congress uses, but does not define a particular word, it is presumed to have adopted that word's established meaning". See United States v. Myers, 972 F.2d 1366, 1572 (11th Cir. 1992)(citing Davis v. Mich. Dept. of Treasury, 489 U.S. 803, 806, 109 S.Ct. 1500, 1503, 103 L.Ed. 2d 891, 899 (1989)).

 Although Section 1997e(e) uses the word 'physical' rather than 'bodily', there is no real difference. Viewed in this context, Plaintiff suffered the "physical" or 'bodily' injury of physical pain from the Defendants' use of chemical agents on his body & the impairment of his eyes & mental faculty, to which he sought mental treatment. See Ex's. 8, 12, & 14.

 Whereas, Plaintiff has adequately opposed the Defendants' Motion for Summary Judgment in regards to his state-law intentional infliction of emotional distress claim & truly believe that specific facts exist demonstrating a genuine issue for trial. See Celetex Corp., 477 U.S. at 324.

## RELIEF  SOUGHT

WHEREFORE, based on the foregoing facts &
Authorities cited herein, Plaintiff respectfully requests
that this Honorable Court deny the Defendant's
Motion for Summary Judgment & schedule a trial
date since there is a genuine dispute about the
facts & any other relief this Court deems
necessary.

b/: Rob
NAME: Robert Johnson, pro se
       FDOC No.: L 10847
ADDRESS: Hardee Corr. Inst.
         6901  SR  62
         Bowling Green, FL   33834

41

## CERTIFICATE   OF   SERVICE

.   I   HEREBY   CERTIFY   that   the   foregoing   is   true   & correct   & A   copy   of   this   motion   has   been   placed   in   the   hands   of   prison   officials   at   Hardee   C.I.   for   purposes   of   mailing   to : (1)   Martin   A.   Fitzpatrick,   United   States   Magistrate   Judge,   United   States   District   Court,   Northern   District   of   Florida,   111   North   Adams   Street,   Tallahassee, FL   32301 - 7717;   (2)   Joe   Belitzky,   Senior   Assistant   Attorney   General,   Office   of   the   Attorney   General,   PL-01   The   Capitol,   Tallahassee, FL   32399 -1050;   on   this   27   day   of   September   , 2021.

b/: Robert

NAME: Robert Johnson, pro se
FDOC No.: L10847
ADDRESS: Hardee / Corr. Inst.
6901 / SR   62
Bowling Green, FL 33834

42

# INDEX   OF   EXHIBITS

**EXHIBIT 1:**   Declaration of Robert Johnson - Plaintiff
pgs. 45 - 54

**EXHIBIT 2:**   Grievence & Response from Bureau of Inmate
pgs. 55 - 57   Grievances & Appeals

**EXHIBIT 3:**   Order from 14th Judicial Circuit
pgs. 58 - 61

**EXHIBIT 4:**   Classification Memo & Witness Statement
pgs. 62 - 64   Requesting PM

**EXHIBIT 5:**   Disciplinary Report (DR)
pgs. 65 - 66

**EXHIBIT 6:**   Witness Statement
pgs. 67 - 68

**EXHIBIT 7:**   DR Hearing Information
pgs. 69 - 70

**EXHIBIT 8:**   Chapter 33-602.210, F.A.C.
pgs. 71 - 74

**EXHIBIT 9:**   Chapter 33-602.221, F.A.C.
pgs. 75 - 77

**EXHIBIT 10:**   Chapter 33-602.222, F.A.C.
pgs. 78 - 80

**EXHIBIT 11:**   Three (3) Inmate Request Forms to
pgs. 81 - 84   the institution's psychologist

43

EXHIBIT 12:   Two (2) Mental Health Screening Evaluation's
pgs. 85 - 90   & one Mental Health Emergency Evaluation

EXHIBIT 13:   A Mental Health Emergency Evaluation
pgs. 91 - 92

EXHIBIT 14:   A Medical Consultant Report & An
pgs. 93 - 95   Inmate Request to Medical

EXHIBIT

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


ROBERT JOHNSON, Plaintiff

    VS.

                   CASE NO. 4:20-cv 410-MW-MAF

CAPTAIN A. MASSEY, et al.,
    Defendants.
                       /



## DECLARATION OF ROBERT JOHNSON


    I, Robert Johnson, pursuant to 28 U.S.C.S. 1746, make this declaration:

    1. On July 28, 2018, I was an inmate at Franklin Correctional Institution.

    2. I have filed this civil rights complaint against the following Defendants - Captain A. Massey, Sergeant A. Dowden & Officer R. Brown -



INSTITUTION ON 9-22-2021 HARDEE CORRECTIONAL FOR MAILING INMATE LEGAL MAIL

1



(46)

As the result of an incident that occurred at Franklin Correctional Institution on July 28, 2018, while I was in confinement there.

3. I specifically recall that on July 28, 2018, I was confined in cell A2-113 alone pending disciplinary confinement / Protective Management status.

4. Sometime between the hours of 6 & 7:00 P.M., on said date, Defendant Dowden - A Dorm's Sergeant - approached my cell door & advised me that I was getting a cellmate.

5. I protested, advising Defendant Dowden that I was in fear for my life because members of security were paying & coercing inmates of different nationalities to threaten & attempt to kill me; therefore, I could not consent to accept a cellmate.

6. Defendant Dowden advised me that I didn't have a choice whether I was getting a cellmate or not; therefore, I refused to submit to hand restraints & requested to speak to the Officer-In-Charge (O.I.C.).

7. Approximately ten to fifteen minutes later, Defendant Massey - the O.I.C. - along with Defendant Dowden & Defendant Brown returned to my cell door with an inmate with them & ordered me to submit to hand restraints.

8. At first I refused to submit to hand restraints & advised all of the

2

(47)

Defendants that I was in fear for my life of the inmate that they were attempting to put in my cell because he could be paid off by security to harm me.

9. After several threats from Defendant Massey, to write me a disciplinary report (DR) & administer chemical agents on me, if I continued refusing to submit to hand restraints, I submitted to hand restraints but advised the Defendants that I was not consenting to accept a cellmate.

10. Once the Defendants opened my cell door to put the other inmate in the cell with me, I stood in the doorway refusing to permit the other inmate to enter the cell, repetitiously pleading to the Defendants that I was in fear for my life; therefore, the Defendants secured my cell door & removed my hand restraints.

11. Approximately twenty to thirty minutes after the Defendants departed from my cell door with the inmate in tow, Defendant Massey returned being video recorded by Defendant Brown via handheld camcorder.

12. Defendant Massey ordered me to cease my disruptive behavior & that if I continued being disruptive, chemical agents would be used on me.

13. After Defendant Massey ordered Defendant Brown to end the video recording, she

3

(48)

ordered me to submit to hand restraints Again.

14. After Advising Defendant Massey that I was not consenting to accept a cellmate, I submitted to hand restraints as ordered.

15. Defendants Massey & Brown removed me from my cell & escorted me out of Wing 2 to a holding cell in the entrance hallway of A dorm.

16. Once the Defendants locked me in the holding cell, they began hurling insults & threats at me.

17. Defendant Massey began by informing me that she was aware of the lawsuit that I filed against the Department of Risk Management & Corrections' officers at Calhoun Correctional Institution & that she was also aware of the numerous grievances that I had written on several staff members at Franklin Correctional Institution.

18. Then she warned me that she didn't give a damn if I was in confinement or on the compound, they were going to get me one way or another because I was in their world & there was nothing that I could do about it.

19. Then Defendant Dowden interjected, calling me a child molestor & a coward motherfucker, promising that I would never make it out of prison alive.

20. Defendant Dowden Also advised

4

me that they had paid the inmate that was designated to be my cellmate to fuck me up & that I was going in the cell with him one way or another.

21. Then Defendant Massey advised me that I could write a grievance about their threats & stated that I might not be alive in the morning.

22. Afterwards, Defendant Brown called me a stupid ass nigger, then the Defendants left me in the holding cell for approximately an hour without any drinking water or toilet.

23. After being in the holding cell over an hour, Defendants Dowden & Brown returned to the holding cell & Defendant Dowden asked me, "Are you ready to die."

24. Afterwards, he ordered me to submit to hand restraints to which I complied.

25. After removing me from the holding cell, Defendants Dowden & Brown escorted me back to wing 2 and attempted to put me back in cell A2-113, where they had put the other inmate while I was in the holding cell.

26. Prior to the Defendants opening my cell door, I noticed that they had put the designated cellmate in my cell therefore, I advised the Defendants that I was not going in the cell with the inmate because I was

5

50

in fear for my life.

27. Then I made a loud announcement for the audio recording device in wing 2 stating, "Audio! Audio! I was taken out of my cell, placed in a holding cell, threatened, & now they're attempting to put me in the cell with this inmate so he can harm me. I am in fear for my life, somebody help me, please!"

28. Defendants Dowden & Brown were nonchalant to my plea.

29. After Defendant Dowden ordered the officer in the control station working the control panel to open my cell door & my cell door was opened, I began putting up a little resistance as the Defendants tried to force me inside the cell.

30. After I refused to budge, Defendant Dowden ordered me to stop resisting before he slammed me on the floor.

31. Once I refused to stop resisting, Defendant Dowden grabbed my left arm & wrists & began bending my arm & wrists upwards, forcing me to bend forward, while Defendant Brown tightly gripped my right arm & together they forcefully shoved me inside of the cell with the other inmate & instantly slammed the cell door.

32. After the door was secured,

6

Defendant Dowden ordered me to relinquish my hand restraints, to which I refused & requested to be either removed from the cell or speak to the O.I.C.

33. After slamming the flap on my cell door, Defendant Dowden smiled & winked at the inmate in the cell with me - whom had his hands cuffed in the front - & walked away from the cell door.

34. Immediately afterwards, the inmate in the cell with me stated, "I got you now nigger boy, you child molesting, writ writing bitch. I'm going to kill your fuck ass."

35. Being that my hands were cuffed behind my back, the inmate attacked me, wrapping his right hand around my neck & began choking me.

36. In an effort to defend myself, I kneed the inmate in the testacles & kicked him in the stomach to create some space between us.

37. The inmate ran at me again & I kicked him as hard as I ~~could~~ in the stomach again. Afterwards, we remained in a standoffish position on opposite sides of the cell hurling insults at each other until the Defendants returned.

38. Moments later, Defendant Massey, accompanied by Defendant Dowden & another female officer, returned to my cell door being recorded via handheld camcorder by Defendant Brown & ordered the inmate in the cell with me to go to a safe

7

corner in the cell.

39. Defendant Massey never gave me an order to relinquish my hand restraints nor attempted to remove me from the cell. Instead, she ordered the other female to spray me with a can of Orthochlorobenzal Melononitrile (OC), which immediately caused my eyes & skin to feel a burning sensation & my lungs to feel respiratorily irritated.

40. Seconds after the chemical agents had been sprayed on me, the inmate in the cell with me began kicking on the cell door & yelling frantically, "I Can't Breathe! I Can't Breathe!"

41. Seconds later, Defendant Dowden opened the flap on the cell door, recuffed the inmate behind his back & removed him from the cell.

42. Prior to the Defendants opening the cell door to retrieve the inmate, he spit at me.

43. After the Defendants took the other inmate out of the cell, they left me in the cell for nearly ten minutes.

44. Afterwards, the Defendants removed me from the contaminated cell & escorted me to a cold water shower in Wing 3.

45. After taking a cold water shower & dressing out in somewhat clean clothing, I was escorted to the nurse's station in the main entrance hallway of A. dorm.

46. While being examined by the nurse, I did not report any major injuries to the nurse

8

because I did not suffer any medical injuries; however, I did feel emotionally distressed due to the occurrence of the incidents.

47. After being examined by the nurse, I was escorted back to cell A2-113 & housed alone.

48. Defendant Brown recorded me in my cell for several minutes before departing.

49. The foregoing facts are known by me to be true & correct based upon my personal knowledge. I am over the age of 18, am competent to testify to the foregoing facts, & would so testify if I appeared in Court regarding this matter. Under penalties of perjury, I declare that I read the foregoing Declaration, & that the facts stated therein are true & correct.

/s/ _____          09/27/2021
NAME: Robert Johnson                      DATE
FADC NO.: L10847

9

(54)

EXHIBIT

2

AG#L21-4-1216

Department of Corrections
Bureau of Inmate Grievance Appeals

**PART B - RESPONSE**

| JOHNSON, ROBERT | L10847 | 18-6-35423 | FRANKLIN C.I. | A2207U |
|---|---|---|---|---|
| NAME | NUMBER | GRIEVANCE LOG NUMBER | CURRENT INMATE LOCATION | HOUSING LOCATION |

Your request for administrative review has been received, reviewed, and evaluated.

Based on our investigation it is recommended you be transferred to resolve protection.  You will remain in Administrative Confinement until a suitable institution and available bed space is located.

Based on the foregoing information, your appeal is approved.

Z. Culpepper

_____
SIGNATURE AND TYPED OR PRINTED NAME OF
EMPLOYEE RESPONDING

_____
SIGNATURE OF WARDEN, ASST.
WARDEN, OR SECRETARY'S
REPRESENTATIVE

8/29/18
DATE

56

P.M. again & filled out a third witness statement detailing the incident from July 4, 2018. As retaliation for me doing so, I was placed on the Management Meal (Loaf) for seven (7) days by Lt. Austin. The following day, I was threatened & assaulted by Sgt. Nelson (see informal grievance Log No.: 113-1807-0244).

Finally, my paperwork requesting P.M. was processed by the administration of this institution & on the 26th day of July, 2018, I was interviewed by Sgt. Ruel whom advised me that my first two (2) witness statements weren't processed because I could not request P.M. against staff; therefore, I revised my witness statement only describing the incident from July 4th involving the inmates.

Consequentially, on the 28th day of July, 2018, I was deprived of my safety while on protective management, conspired against, threatened, hurled insults at, physically assaulted by staff (an inmate, an unjustifiably used chemical agents on as retaliation for me being in fear of my life. (see informal grievance Log No.: 113-1807-0284, & informal grievance Log No.: 113-1808-0021) Then, on the 30th day of July, 2018, I was denied P.M. by I.C.T. & on the 31st day of July, 2018, I was informed by Classification Officer Polly Smith that S.C.O had also denied me P.M. Therefore, I am seeking further review of this matter from this agency!

EXHIBIT

3

IN THE CIRCUIT COURT
OF THE FOURTEENTH JUDICIAL CIRCUIT
IN AND FOR CALHOUN COUNTY, FLORIDA
CIVIL DIVISION

CASE NO.:   18-17 CA

ROBERT L. JOHNSON, DOC# L10847,
        Plaintiff,

v.

FLORIDA DEPARTMENT OF INSURANCE,
DEPARTMENT OF RISK MANAGEMENT,
SGT. J. SIKES, AND
OFFICER W. RATLIFF,
        Defendants.

---

<u>ORDER DIRECTING COMPLIANCE WITH SECTION 57.085, FLORIDA STATUTES</u>

THIS MATTER is before the Court on the Plaintiff's Complaint filed April 5, 2018. Having reviewed said Complaint, court file and records, and being otherwise fully advised, the Court hereby finds as follows:

The Plaintiff has failed to comply with Section 57.085, Florida Statutes. This Complaint is subject to filing fee and lien requirements of Section 57.085, Fla. Stat..

Prisoner litigants are not exempt from the filing fee for their civil action filed in the civil cases. In 1996, the Legislature enacted the Prisoner Indigency Statute, codified at section 57.085 of the Florida Statutes. Pursuant to the statute, unlike a civil litigant where the filing fee may be exempted from paying the filing fee, if a prisoner is found to be indigent, the prepayment of costs is "deferred," i.e., the prisoner is required to make an initial prepayment, if able to do so, and then a lien is placed on his or her prison account for payment of the remainder in monthly installments. <u>See</u> § 57.085, Fla. Stat. (2005).

Section 57.085, Fla. Stat., provides, in relevant part.

(2) When a prisoner who is intervening in or initiating a judicial proceeding seeks to defer the prepayment of court costs and fees because of indigence, the prisoner must file an <u>affidavit of indigence</u> with the appropriate clerk of the court. The affidavit must contain complete information about the prisoner's identity; the nature and amount of the prisoner's income; all real property owned by the prisoner; all tangible and intangible property worth more

than $100 which is owned by the prisoner; the amount of cash held by the prisoner; the balance of any checking, savings, or money market account held by the prisoner; the prisoner's dependents, including their names and ages; the prisoner's debts, including the name of each creditor and the amount owed to each creditor; and the prisoner's monthly expenses. <u>The prisoner must certify in the affidavit whether the prisoner has been adjudicated indigent under this section, certified indigent under s. 57.081, or authorized to proceed as an indigent under 28 U.S.C. s. 1915 by a federal court.</u> The prisoner must attach to the affidavit a photocopy of the prisoner's <u>trust account records for the preceding 6 months</u> or for  the length of the prisoner's incarceration, whichever period is shorter. The affidavit must contain the following statements: "I am presently unable to pay court costs and fees. Under penalty of perjury, I swear or affirm that all statements *oath* in this affidavit are true and complete."

(3)     Before a prisoner may receive a deferral of prepayment of any court costs and fees for an action brought under this section, the clerk of court must review the affidavit and determine the prisoner to be indigent.

(4)     When the clerk has found the prisoner to be indigent but concludes the prisoner is able to pay part of the court costs and fees required by law, the court shall order the prisoner to make, prior to service of process, an initial partial payment of those court costs and fees. The initial partial payment must total at least 20 percent of the average monthly balance of the prisoner's trust account for the preceding 6 months or for the length of the prisoner's incarceration, whichever period is shorter.

(5)     When the clerk has found the prisoner to be indigent, the court shall order the prisoner to make monthly payments of no less than 20 percent of the balance of the prisoner's trust account as payment of court costs and fees. When a court orders such payment, the Department of Corrections or the local detention facility shall place a lien on the inmate's trust account for the full amount of the court costs and fees, and shall withdraw money maintained in that trust account and forward the money, when the balance exceeds $10, to the appropriate clerk of the court until the prisoner's court costs and fees are paid in full.

The purposes behind the enactment of section 57.085 was to discourage frivolous civil lawsuit filed by inmate litigants and to reduce the amount of court resources wasted on these lawsuits. <u>See</u> <u>Cason v. Crosby,</u> 892 So. 2d 536, 537 (Fla. 1st DCA 2005) ("In 1996, the legislature enacted section 57.085, the prisoner indigency statute, in order to reduce unnecessary or frivolous prisoner filings."); <u>Geffken v. Strickler,</u> 778 So. 2d 975, 977 (Fla. 2001) ("The legislative history of these amendments [such as 57.085] makes clear that the intent of all the amendments was to reduce the filing of frivolous lawsuits and reduce the amount of funds unnecessarily expended on such lawsuits in the courts."). The Florida Supreme Court has supported the legislative pronouncement that "inmates contribute toward the costs of their lawsuit and ultimately pay for the lawsuit in full if they subsequently become able to do so." <u>Jackson v. Department of Corrections,</u> 790 So. 2d 381, 383 - 384 (Fla. 2000).

Page 2 of 3
Order Directing Compliance with Section 57.085, Florida Statutes
Robert L. Johnson, DOC# L10847 v. FL Department of Insurance, Et Al/ 18-17 CA

60

Therefore, it is,

ORDERED AND ADJUDGED that the Plaintiff shall comply with requirements of Section 57.085, Florida Statutes and this matter is hereby STAYED until the Plaintiff has complied with requirements of Section 57.085, Florida Statutes.

DONE AND ORDERED in chambers, Calhoun County, Florida, this 31st day of _____ May _____ 2018.

HONORABLE SHONNA YOUNG GAY,
CIRCUIT JUDGE

I HEREBY CERTIFY that a true and exact copy of the foregoing has been provided by U.S. Mail to **Robert L. Johnson**, DOC# L10847, Franklin Correctional Institution, 1760 Highway 67 North, Carrabelle, Florida 32322, this 1st day of _____ June _____ 2018.

Wendy Strickland, Judicial Assistant

Page **3** of 3
Order Directing Compliance with Section 57.085, Florida Statutes
Robert L. Johnson, DOC# L10847 v. FL Department of Insurance, Et Al/ 18-17 CA

61

EXHIBIT

4

R. Johnson DC#L10847

AG#L21-4-1216

00064-RFP1

**STATE OF FLORIDA**
**DEPARTMENT OF CORRECTIONS**

**FRANKLIN CORRECTIONAL INSTITUTION**

EST. 1960

MEMO TO: CLASSIFICATION SUPERVISOR A. SEGREE

FROM: CAPTAIN B. AUSTIN

DATE: JULY 21, 2018

SUBJECT: I/M JOHNSON, ROBERT DC#L10847

---

On July 21, 2018 Inmate Johnson, **Robert DC#L10847** requested protection. He stated that On July 4th 2018 sometime between the hours of 9:30 and 10:30 am, I was approached and threatened by several inmates, and several different nationalities. I don't know them if I don't get off this compound they are going to deal with me immediately. I informed Sergeant Varnes of this matter and was placed confinement pending P.M. Inmate Johnson was unable to provide further details about the incident couldn't describe any inmates that allegedly threatened him.

63

**Witness Statement**

| State of Florida | Log # _____ _____ | Department of Corrections |
|---|---|---|

| **I.** | **Identifying Inmate Information** |
|---|---|

DC.# _L 10847_    Inmate Name _Johnson, Robert T_

Violation Code and Short Title _____

Date Report Written _____

| **II.** | **Witness** |
|---|---|

☐    Staff Member: Name and Position _____

☐    Other Individual: Name _____

☐    Inmate:    DC # _____    Name _____

| **III.** | **Voluntary Refusal** |
|---|---|

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature _____ Date _____

Signature of Investigating Officer _____ Date _____

| **IV.** | **Statement** On July 4th, 2018, sometime on or between the hours of 9:30 & 10:50 a.m., I |
|---|---|

was approached & threatened by several inmates; several different nationalities. I don't know the names 'of these individuals because they had on T-shirts. They said that I was creating problems for them & if I didn't get off of the compound, they were going to deal with me. Immediately I informed Sgt. Varnes of this. Another ½ hour passed in confinement pending @ P.M.

Witness Signature _[signature]_     Date _07/26/2018_

Signature of Investigating Officer _[signature]_     Date _7-26-2018_

DC6-112C (Revised 5-00)     Original: Inmate File     Copy: Central Office

64

# EXHIBIT

## 5

R. Johnson, DC#L10847

AG#L21-4-1216

00038-RFP1

FLORIDA DEPARTMENT OF CORRECTIONS          07/05/2018
CHARGING DISCIPLINARY REPORT                              PAGE:     1
LOG # 113-181576

--------------------------------------------------------------
DC#: L10847   INMATE NAME: JOHNSON, ROBERT          INFRACTION
VIOLATION CODE:          TITLE: DISRESP.TO OFFICIALS   DATE: 07/04/18
FACILITY CODE:  113    NAME:  FRANKLIN C.I.            TIME: 09:45
--------------------------------------------------------------

I.    STATEMENT OF FACTS
      ON JULY 4, 2018, I, SERGEANT R. VARNES WAS ASSIGNED AS HOTEL
      DORMITORY HOUSING SERGEANT. AT APPROXIMATELY 9:45AM I WAS
      PRESENT AT THE CENTER TOWER AREA WHEN I HEARD AND OBSERVED
      OFFICER NEWBOLD INSTRUCT INMATE JOHNSON, ROBERT DC#L10847,
      TO SECURE A CENTER TOWER GATE, AT WHICH TIME INMATE JOHNSON
      STATED TO OFFICER NEWBOLD "SUCK MY DICK, PUSSY BITCH".
      INMATE JOHNSON IS IN DIRECT VIOLATION OF F.A.C. CHAPTER
      33.601.314 RULES OF PROHIBITED CONDUCT      DISRESPECT TO
      OFFICIALS, EMPLOYEES, OR OTHER PERSONS OF CONSTITUTED
      AUTHORITY EXPRESSED BY MEANS OF WORDS, GESTURES AND THE
      LIKE. INMATE JOHNSON WAS PLACED IN ADMINISTRATIVE
      CONFINEMENT PENDING THE DISPOSITION OF THIS REPORT. THE
      SHIFT SUPERVISOR WAS NOTIFIED AND AUTHORIZED THIS REPORT TO
      BE WRITTEN.

      REPORT WRITTEN: 07/04/18, AT 11:00      BY:        - VARNES, RALPH D.
--------------------------------------------------------------

II.  INMATE NOTIFICATION OF CHARGES: DATE DELIVERED: 7 / 5 /18 , AT 04 : 50

         NO HEARING SHALL COMMENCE PRIOR TO 24 HOURS OF DELIVERY OF CHARGES
         EXCEPT WHEN THE INMATE'S RELEASE DATE DOES NOT ALLOW TIME FOR SUCH
         NOTICE OR THE INMATE WAIVES THE 24 HOUR PERIOD AS AUTHORIZED IN RULE
         33-601, FLORIDA ADMINISTRATIVE CODE.

         DELIVERED BY
--------------------------------------------------------------

NOTICE TO INMATE:
AS AN INMATE BEING CHARGED WITH A VIOLATION OF THE RULES OF PROHIBITED
CONDUCT, YOU ARE ADVISED THE FOLLOWING:
--------------------------------------------------------------

INVESTIGATION:
AN IMPARTIAL INVESTIGATION WILL BE CONDUCTED ON THIS DISCIPLINARY REPORT.
DURING THE INVESTIGATION OF THE DISCIPLINARY REPORT, YOU WILL BE ADVISED
OF THE CHARGES AGAINST YOU AND YOU MAY REQUEST STAFF ASSISTANCE. DURING
THE INVESTIGATION YOU SHOULD MAKE KNOWN ANY WITNESSES TO THE INVESTIGATING
OFFICER. THE TESTIMONY OF WITNESSES SHALL BE PRESENTED BY WRITTEN STATEMENTS.
SEE RULE 33-601.307(3) FOR COMPLETE INFORMATION REGARDING WITNESSES. YOU WILL
HAVE THE OPPORTUNITY TO MAKE A STATEMENT IN WRITING REGARDING THE CHARGE AND
TO PROVIDE INFORMATION RELATING TO THE INVESTIGATION.
--------------------------------------------------------------

EXHIBIT

6

**Witness Statement**

| State of Florida | Log # 113-1801576 | Department of Corrections |
|---|---|---|

**I.   Identifying Inmate Information**

DC#   L10847        Inmate Name        Johnson, Robert

Violation Code and Short Title              Disrespect to Officials
Use of Force #
Date Report Written              02/04/18

**II.   Witness**

☐   Staff Member:  Name and Position   _____

☐   Other Individual:  Name   _____

☒   Inmate:   DC#   L10847        Name        Johnson, Robert

**III.   Voluntary Refusal**

*The witness voluntarily refused to provide a written statement to the Investigating Officer and the following signature(s) attests to that fact:*

Witness Signature   _____   Date _____

Signature of Investigating Officer   _____   Date _____

**IV.   Statement** On 07/04/2018, sometime between the hours of 9 & 10:00 A.M., I returned to my assigned dormitory - H2 - from laundry. Upon entering H2, I was stopped & approached in the vestibule by Sgt. Varnes & Ofc. ~~I~~ Irvin. Sgt. Varnes then began to threaten me. ~~I totally~~ stating that he did not want me in his dorm. At that time, Sgt. Varnes escorted me to the Center Tower Gate constantly threatening to have me physically attacked by other inmates. At that time, I requested Protective Management. Upon entering the Center Tower Area, Sgt. Varnes placed me in hand restraints & instructed me to wait for the Captain. At no time did Ofc. Newbold instruct me to close Any gate nor did I state "suck my dick pussy bitch." Therefore, this D.R. is frivolous & Sgt. Varnes is in noncompliance with the Florida Administrative Code by fraudulently falsifying documents. An impartial review of the security camera for the Center gate Tower & H2 will verify my statement & refute of Sgt. Varnes statement.

Witness Signature   *[signature]*        Date 07/05/2018
Signature of Investigating Officer   *[signature]*   Date 7-5-18

DC6-112C (Revised 8/06)              Original:  Inmate File              Copy:  Central Office

68

EXHIBIT

7

R. Johnson, DC#L10847                    AG#L21-4-1216                    00037-RFP1

```
                    FLORIDA DEPARTMENT OF CORRECTIONS        07/17/2018
                         DISCIPLINARY REPORT                 PAGE  1
                         HEARING INFORMATION
                         LOG # 113-181576
------------------------------------------------------------------------------
DC#: L10847   INMATE NAME: JOHNSON, ROBERT            A2113L INFRACTION
VIOLATION CODE:         TITLE: DISRESP.TO OFFICIALS    DATE: 07/04/2018
FACILITY CODE:   113   NAME:  FRANKLIN C.I.            TIME: 09.45
------------------------------------------------------------------------------
         TEAM   FINDINGS AND ACTION   DATE: 07/12/2018, AT: 11.45
         INMATE OFFERED STAFF ASSISTANCE: DECLINED
         INMATE PLEA: NOT GUILTY   FINDINGS: GUILTY
         INMATE PRESENT: YES
     POSTPONEMENT:
     BASIS FOR DECISION:
         THE TEAM FINDS INMATE GUILTY BASED ON THE STATEMENT OF FACTS
         WRITTEN IN SECTION 1 AND THE EVIDENCE PROVIDED AT THE
         HEARINGON JULY 4, 2018, I, SERGEANT R. VARNES WAS ASSIGNED
         AS HOTEL DORMITORY HOUSING SERGEANT. AT APPROXIMATELY 9:45AM
         I WAS PRESENT AT THE CENTER TOWER AREA WHEN I HEARD AND
         OBSERVED OFFICER NEWBOLD INSTRUCT INMATE JOHNSON, ROBERT
         DC#L10847, TO SECURE A CENTER TOWER GATE, AT WHICH TIME
         INMATE JOHNSON STATED TO OFFICER NEWBOLD "SUCK MY DICK,
         PUSSY BITCH".  INMATE REQUESTED NO WITNESSES. BASED UPON
         REVIEW OF THE IDENTIFIED TAPE OR THE CAPABILITIES OF THE
         PARTICULAR TAPING EQUIPMENT, THE TAPE REQUESTED DOES NOT
         PROVIDE EVIDENCE TO SUPPORTTHE INMATE'S STATEMENT.


     ACTIONS TAKEN:
     DISCIPLINARY CONFINEMENT:   22; PROBATION DAYS SET:   0 CONCURRENT
     ALTERNATIVE HOUSING:      0000;

     RESTITUTION:     $.00; INDIV.REVIEW/COUNSEL?: N; CONFISCATE CONTRABAND?: N
        COMMENTS:
        30 DAY OVERALL SENTENCE WITH 8 DAYS AC CREDIT AWARDED
        FOR A TOTAL OF 22 DAYS DISCIPLINARY CONFINEMENT.

     TEAM CHAIRMAN:            - SMITH, POLLY
     TEAM MEMBERS:            - CHISHOLM, JESSICA           -
------------------------------------------------------------------------------
------------------------------------------------------------------------------
```

7D

EXHIBIT

8

*34*

in the volume of mail and telephone activity. This increased volume places an undue burden on staff to monitor the additional mail and telephone calls to ensure the security and order of the institution and the safety of staff, inmates and the general public. Engaging in a business or profession also includes individual activities with profit or revenue potential, such as submission of a manuscript for publication when one of the objectives of such publication is the generation of revenue. Inmates are prohibited from entering into marketing agreements with literary agents for the marketing of literary works in exchange for a portion of any commissions received. An inmate who wishes to submit writings for publication shall provide a written statement to mailroom staff verifying that the inmate is not seeking compensation, nor will he accept compensation for the writings.

(3) An inmate who is engaged in a business or profession prior to commitment to the department shall assign authority for the operation of such business or profession to a person in the community within 90 days of commitment. When it is necessary to utilize the mail or telephone for this purpose, the inmate shall coordinate this activity through his classification officer.

(4) Incoming or outgoing mail relating to the direction of an inmate's business or profession shall be rejected.

(5) Any inmate who attempts to conduct a business or profession through the mail, telephone, or any other avenue of communication while incarcerated shall be subject to disciplinary action in accordance with Rules 33-601.301-.314, F.A.C.

(6) Inmates shall not be restricted from mail, telephone, or other non-prohibited communications necessary to enable an inmate to protect property and funds that were legitimately the inmate's at the time of commitment.

*Rulemaking Authority 944.09 FS. Law Implemented 944.09 FS. History–New 8-10-03, Amended 2-25-08.*

### 33-602.210 Use of Force.

(1) Definitions.

(a) Controlled Conditions – Circumstances in which the inmate upon whom force would be used is secured in a cell, shower room, recreation enclosure, isolation management room, or similarly secure setting, and is not causing, or posing a threat of, any harm to themselves or others.

(b) Correctional Emergency Response Team – A team comprised of staff trained in special tactics including the use of deadly force for the intervention and resolution of life-threatening crisis events.

(c) Crisis Intervention Techniques (CIT) – Methods used to offer immediate, short-term help to individuals who experience an event that produces emotional, mental, physical, and behavioral distress or problems.

(d) Crisis Intervention Techniques Training – This training assists staff persons in applying non-force de-escalation techniques and strategies in the care and control of inmates suspected to be mentally ill.

(e) CS – Orthochlorobenzal Malononitrile or Orthochlorobenzylidene Malononitrile – An irritant agent that causes a burning sensation and tearing of the eyes, nasal discharge, and skin and upper respiratory irritation.

(f) Custodial grasp – A department staff person's firm grasp of the tricep(s) or elbow(s) of an inmate who is being transported internally and who is proceeding appropriately.

(g) Deadly Force – Force that is likely to cause death or great bodily harm.

(h) Direct Firing – The practice of firing specialty impact munitions directly into a group of rioters with a target area of the waist or below from no less than a minimum distance designated by the manufacturer of the munitions.

(i) Electronic Immobilization Device (EID) – A device (either hand-held, shield, or belt/band type) that delivers an immobilizing electric charge of pre-determined and preset duration.

(j) Emergency Action Center – The unit located in the Central Office charged with receiving reports regarding serious incidents, such as riots and escapes, from all Department of Corrections' (Department) facilities and reporting the information to the proper authorities. This unit also receives requests for criminal histories, warrant confirmations, and offender location requests from law enforcement agencies throughout the United States.

(k) Incident Commander – The employee responsible for the management of emergency incidents, such as riots and natural disasters.

(l) Isolation Management Room – A room in an infirmary or inpatient mental health unit that is used for observation and management of inmates who present symptoms of acute mental impairment, inmates who present a risk of serious self-injurious behavior, and other inmates in need of observation for mental health reasons.

(m) Less-Lethal Weapons – Weapons whose standard use is less likely to cause death or great bodily harm than are firearms loaded with lethal ammunition. Less-lethal weapons include, but are not limited to, electronic immobilization devices (EIDs), batons, the types of chemical agents mentioned in subsection (6), and specialty impact munitions.

(n) Less Than Lethal Force – Any force that is neither intended nor likely to cause death or serious bodily harm.

(o) Observation Cells – Cells in areas outside of an infirmary/inpatient mental health unit that meet the safety and custodial standards of an isolation management room.

(p) OC – Oleoresin Capsicum (pepper spray) – An inflammatory agent that causes tearing and involuntary closing of the eyes, nasal discharge, sneezing, disorientation, and the sensation of respiratory distress. OC is the primary chemical agent to be utilized for cell extractions and other in-cell uses unless circumstances exist as outlined below.

(q) Organized Use of Force – Any force that may be administered to control, escort, or geographically relocate an inmate, or to quell a disturbance in controlled conditions, when the immediate application is not necessary to prevent a hazard to any person.

(r) Psychiatric restraints are devices, procedures, or techniques used to restrict movement or behavior as to greatly reduce or eliminate the ability of an individual to harm him/herself or others, and include, but are not limited to, four-point and five-point psychiatric restraints.

(s) Qualified Mental Health Professional – A clinician who is credentialed and approved by the Department's credentials review committee or a Department contractor to provide mental health treatment and services to an inmate assigned to a given level of mental health care.

(t) Rapid Response Team – A team comprised of Correctional Officers specially trained in less-lethal and lethal munitions, chemical munitions, crowd control, and riot suppression.

(u) Reactionary Use of Force – Any force that must be administered quickly or immediately to compel the cessation of an inmate's violence or resistance to orders.

(v) Reasonable Force – Any force that is not excessive for protecting oneself or another or for gaining an inmate's compliance with a lawful order.

(w) Rubber Ball Rounds – Multiple pellets fired from cartridges at the lower extremities of rioters and designed to inflict pain compliance.

(x) S-2 – The mental health classification denoting mild impairment in the ability to meet the ordinary demands of living within general inmate housing (which includes segregation) due to a diagnosed mental disorder. The impairment in functioning is not so severe as to prevent satisfactory adjustment in general inmate housing with provision of mental health services. Clinical management of the disorder may require at least periodic administration of psychotropic medication, which the inmate may exercise his or her right to refuse.

(y) S-3 – The mental health classification denoting moderate impairment in the ability to meet the ordinary demands of living within general inmate housing, due to a diagnosed mental disorder. The impairment in functioning is not so severe as to prevent satisfactory adjustment in general inmate housing with provision of mental health services. Clinical management of the disorder may require at least periodic administration of psychotropic medication, which the inmate may exercise his or her right to refuse.

(z) Self-Injurious Behavior – Behavior in which an inmate is attempting to hang him/herself, possesses or utilizes an instrument for self-injury or any other action in which risk to the inmate's life or safety is imminent.

(aa) Great Bodily Harm – A physical condition that creates a substantial risk of death, serious personal disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

(bb) Shift Supervisor – The highest ranking correctional officer of the on-duty shift.

(cc) Skip Firing – The practice of firing specialty impact munitions 5-7 feet in front of rioters, thereby deflecting the munitions into the legs of the rioters.

(dd) Specialty Impact Munitions – Munitions designed to incapacitate, distract, and control a subject with a relatively low likelihood of life-threatening injury.

(ee) Uninvolved CIT-Trained Staff Member – A CIT-trained staff member who is not involved in the events leading up to the need to use force.

(ff) Wooden Baton Rounds – Multiple wooden projectiles fired from a 37/40-mm weapon, designed to be skip fired into the lower extremities of rioters to inflict pain compliance.

(2) Authorization to Use Force.

(a) The following authorization to use force is subject to every other provision of this rule. Department staff, and staff of a contractor who are responsible for supervising inmates, are authorized to apply force on an inmate only when they reasonably believe it to be necessary to:

1. Defend himself, herself, or others against imminent or already occurring unlawful force,

EXHIBIT

9

R. Johnson, DC#L10847                    AG#L21-4-1216                              00331-RFP1

**33-602.221 Protective Management.**
(1) Definitions.

housing supervisor to assess the inmate's potential risk to or from other inmates in the unit. The completion of this review shall be documented on Form DC6-235, Record of Protective Management. Form DC6-235 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 South Calhoun Street, Tallahassee, Florida 32399-2500. The effective date of the form is 1-19-03. If the inmate cannot be placed for this reason, the housing supervisor shall place or maintain the inmate in administrative confinement until the issue can be expeditiously resolved. The case shall be immediately forwarded to the ICT for review. The ICT shall review the case and interview the inmate and forward recommendations to the SCO. The SCO shall review the case and may interview the inmate and make a final decision to resolve the inmate's protection needs.

(3) Protective Management Facilities.

(a) The number of inmates housed in a protective management cell shall not exceed the number of beds in the cell. Exceptions may be made during an emergency situation as approved by the warden or duty warden, but such exceptions shall not continue for more than 24 hours without the specific written authorization of the regional director of institutions. Prior to placing inmates in the same cell, a determination shall be made by the housing supervisor that none of the inmates constitute a threat to any of the others, and document such on Form DC6-235, Record of Protective Management.

(b) All protective management housing units shall be equipped with toilet facilities and running water for drinking and other sanitary purposes and other furnishings as are provided to comparable housing cells for inmates in general population at the particular institution.

(c) Prior to placement of an individual in a protective management cell, the cell shall be thoroughly inspected to ensure that the cell is in proper order. The officer conducting the inspection must complete and sign Form DC6-221, Cell Inspection, attesting to the condition of the cell. The inmate housed in that cell shall then be held responsible for the condition of the cell. Form DC6-221 is incorporated by reference in Rule 33-601.800, F.A.C.

(d) Whenever possible, protective management housing units shall be physically separate from other housing units given the physical design of the facility. The number of inmates housed in protective management shall not exceed the number of bunks in the protective housing unit. Whenever such location is not possible, physical barriers shall preclude the cross association of those inmates in protective management with those inmates in other statuses. Protective management housing units shall be built to permit verbal communication with and unobstructed observation by Department staff.

(4) Conditions and Privileges.

(a) Clothing – inmates in protective management may wear shower slides or personal canvas shoes while in their housing units, but regulation shoes shall be required for work assignments. Otherwise, the clothing for inmates in protective management shall be the same as that issued to and exchanged with inmates in general population except when this may create a potential security or health threat, or when additional clothing is required for a work assignment. In such cases the exceptions shall be documented on Form DC6-235, Record of Protective Management, and approved by the chief of security. Any item may be removed from the cell in order to prevent the inmate from inflicting injury to himself, herself or others, to prevent the destruction of property or equipment, or to prevent the inmate from impeding security staff from accomplishing functions essential to the unit and institutional security. If an inmate's clothing is removed, a modesty garment shall be immediately given to the inmate. If the inmate chooses not to wear the garment, the garment shall be left in the cell and this action shall be noted on Form DC6-235, Record of Protective Management, stating the reasons for such denial. Under no circumstances shall an inmate be left without a means to cover himself or herself.

(b) Bedding and linen – inmates in protective management shall have bedding and linen issued and exchanged in the same manner as is provided to inmates in general population. Any exception shall be based on the potential threat of harm to an individual or a potential threat to the security of the institution. The shift supervisor or the confinement lieutenant must approve the action initially. Such exceptions shall be documented on Form DC6-235, Record of Protective Management, and the chief of security shall make the final decision regarding the appropriateness of the action no later than the next working day following the action.

(c) Personal Property – inmates in protective management shall be allowed to retain the same property as is permitted inmates in general population unless the property poses a potential threat of harm to an individual or a potential threat to the security of the institution. In such case, the removal or denial of any item shall be documented on Form DC6-235, Record of Protective Management, and Form DC6-220, Inmate Impounded Property List, which must be completed by security staff and signed by the inmate designating what property was removed. The original shall be placed in the inmate's property file and a copy of the form shall be given to the inmate for his or her records. Form DC6-220 is incorporated by reference in Rule 33-602.201, F.A.C. All property retained by inmates must fit into the storage area provided, which shall be the same size as provided for inmates in general population.

EXHIBIT

10

**33-602.222 Disciplinary Confinement.**

(1) Definitions.

(a) Bureau of Braille and Talking Book Library – refers to the agency that provides books on tape, Braille books, and other auxiliary aids for individuals who, due to a disability are unable to read books in print.

(b) Central Office ADA Coordinator – refers to the employee responsible for implementing the provisions of Title I and Title II of the Americans with Disabilities Act and Section 504 of the 1973 Rehabilitation Act within the Department.

(c) Clinical Health Care Personnel -- where used herein, refers to a physician, clinical associate, nurse correctional medical technician certified (CMTC), psychologist, psychology intern, psychology resident, or psychological specialist.

(d) Review, where used herein, refers to the evaluation of pertinent information or documentation concerning an inmate's disciplinary confinement status to determine if changes or modifications in the confinement status are required or recommended.

(e) Visit, where used herein, refers to the official inspection and tour of a confinement unit by a staff member.

(f) Disciplinary Confinement refers to a form of punishment in which inmates found guilty of committing violations of the department rules are confined for specified periods of time to individual cells based upon authorized penalties for prohibited conduct.

(g) Disciplinary Hearing refers to an administrative proceeding in which it is determined if sufficient evidence exists to find an inmate guilty of a rule violation.

(h) Disciplinary Team refers to a team made up of at least two staff persons appointed by the warden, one of whom shall be a correctional officer lieutenant or above.

(i) Institutional Classification Team (ICT) refers to the team consisting of the warden or assistant warden, classification supervisor, chief of security, and other members as necessary when appointed by the warden or designated by rule. The ICT is responsible for making work, program, housing and inmate status decisions at a facility and for making other classification recommendations to the State Classification Office (SCO). At private facilities, the Department of Corrections representative is to be considered a fourth member of the ICT when reviewing all job/program assignments, transfer, and custody recommendations/decisions. If a majority decision by the ICT is not possible, the decision of the Department of Corrections representative is final.

(j) Security Pens refers to a specially designed flexible ink pen that bends under pressure and has a tip that retracts under excessive pressure.

(k) Shift Supervisor refers to the correctional officer in charge of security on any work shift.

(l) State Classification Office (SCO) refers to the office or office staff at the central office level that is responsible for the review of inmate classification decisions. Duties include approving, disapproving, or modifying ICT recommendations.

(m) Housing Supervisor – the correctional officer sergeant, or above, who is in charge of the disciplinary confinement unit for a particular shift.

(n) Offender Based Information System (OBIS) – refers to an electronic data system used by the Department of Corrections to record and retrieve offender information.

(2) Placement in Confinement.

(a) Inmates shall be given pre-confinement medical evaluations by medical staff prior to being placed in disciplinary confinement. Any inmate currently in another confinement status who received a pre-confinement medical assessment will not be required to have another prior to placement in disciplinary confinement.

(b) Disciplinary confinement cells shall be physically separate from other confinement statuses whenever possible. Whenever such location is not possible, physical barriers shall preclude the cross association of those in disciplinary confinement with those in other housing statuses. The disciplinary confinement cells shall be approximately the same square footage as utilized for general population. Disciplinary confinement units shall be built to permit verbal communication and unobstructed observation by staff. Visual inspections shall be conducted of each cell, to include at a minimum, observations for clothes lines, pictures attached to the walls and lockers, windows or light fixtures covered with paper, clothes or towels, and air and heater vents that have been obstructed. When sufficient natural light is unavailable, interior cell lights shall be left on during day and evening hours.

(3) Disciplinary Confinement Cells.

(a) Inmates shall not be housed in disciplinary confinement cells in greater number than there are beds in the cells. The only exception to this policy is during an emergency situation as declared by the warden or duty warden. Any emergency situation shall be communicated to the regional director of institutions and to the Emergency Action Center in the central office. If this exception

exists in excess of 24 hours, the warden or duty warden must get specific written authorization from the regional director of institutions to continue to house inmates beyond the 24-hour period in such conditions. Prior to placing inmates in the same cell, the inmates shall be interviewed by the housing supervisor to ensure that none of the inmates constitute a threat to any of the others.

(b) All disciplinary confinement cells shall be equipped with toilet facilities and running water for drinking and other sanitary purposes. Water in the cell can be turned off by correctional staff due to an inmate's inappropriate behavior that causes an interruption in the water system or the intentional misuse of water for an unauthorized purpose. In such event, the inmate occupant will be furnished an adequate supply of drinking water by other means to prevent dehydration. These actions shall be documented on Form DC6-229, Daily Record of Special Housing. Form DC6-229 has been incorporated by reference in Rule 33-601.800, F.A.C.

(c) Prior to the inmate's placement into, and after the inmate's removal from, a disciplinary confinement cell, the cell shall be thoroughly inspected to ensure that it is in proper order and the inmate housed in that cell will then be held responsible for the condition of the cell. The correctional officer conducting the inspection shall complete and sign Form DC6-221, Cell Inspection, attesting to the condition of the cell. Form DC6-221 is incorporated by reference in Rule 33-601.800, F.A.C. Routine searches of each cell are authorized at any time, but shall be conducted, at a minimum, each time an inmate is removed from the cell for a shower. All searches shall be documented on Form DC6-229, Daily Record of Special Housing. All inmates shall be searched prior to entering the confinement unit and upon departure. All items entering the confinement unit shall be thoroughly searched, to include at a minimum, food carts and trays, laundry and linens, and inmate property.

(d) The officers assigned shall exercise care to maintain noise levels in confinement units at a reasonable level so as not to interfere with normal operating activities.

(4) Conditions and Privileges.

(a) Clothing. Inmates in disciplinary confinement shall be provided the same clothing and clothing exchange as the general inmate population. Exceptions shall be made on an individual basis when evidence suggests it would be in the best interest of the inmate or security of the institution. In such cases, the exceptions shall be noted on the Daily Record of Special Housing, Form DC6-229, and approved by the chief of security. Shower slides may be substituted for regulation shoes. Any item may be removed from the cell in order to prevent the inmate from inflicting injury to him or herself or to others or to prevent the destruction of property or equipment. If an inmate's clothing is removed, a modesty garment shall be immediately obtained and given to the inmate. If the inmate chooses not to wear the garment, the garment shall be left in the cell and this action shall be documented on Form DC6-229. Under no circumstances shall an inmate be left without a means to cover him or herself.

(b) Bedding and linen. Inmates in disciplinary confinement shall have bedding and linen issued and exchanged in the same manner as is provided to the general inmate population. Any exceptions shall be based on potential harm to individuals or a clear threat to the security of the institution. Such exceptions shall be documented on Form DC6-229, Daily Record of Special Housing.

(c) Personal Property. Inmates in confinement shall be allowed to retain stamps, eyeglasses, hearing aids, personal watches, and rings unless there is an indication of a security problem. Inmates in disciplinary confinement may also possess religious items pursuant to the provisions of Rule 33-602.201, F.A.C. If removal of any item in the inmate's possession is determined necessary, the correctional staff shall document their actions on the Form DC6-229, Daily Record of Special Housing, which shall be approved by the chief of security. The correctional staff shall issue the inmate a receipt for her or his confiscated items by completing the Inmate Impounded Personal Property List, Form DC6-220. Form DC6-220 is incorporated by reference in Rule 33-602.201, F.A.C. Inmates in disciplinary confinement shall not possess any products that contain baby oil, mineral oil, cocoa butter, or alcohol.

(d) Comfort Items. Inmates in confinement shall be afforded, at a minimum, the following comfort items: toothbrush, toothpaste, bar of soap, towel (or paper towels), toilet tissue, and feminine hygiene products for women.

(e) Personal Hygiene. Inmates in disciplinary confinement shall meet the following standards in regards to personal hygiene as required of the general inmate population:

1. At a minimum, each inmate in disciplinary confinement shall shower three times per week.

2. Male inmates shall be required to shave at least three times per week. The possession and use of shaving powder in disciplinary confinement is prohibited. An inmate housed in disciplinary confinement who is medically exempt from using shaving razors will be clipper-shaved at least three times per week.

3. Hair care shall be the same as that provided to, and required of, general population inmates.

(f) Diet and Meals. Inmates in disciplinary confinement shall receive meals representative of the food served to the general population, but not necessarily a choice of every item. Any food item that might create a security problem in the confinement unit shall be replaced with another item of comparable quality and quantity. Utilization of the special management meal is authorized for

EXHIBIT

11

**STATE OF FLORIDA**
**DEPARTMENT OF CORRECTIONS**

# INMATE REQUEST

Mail Number: _____
Team Number: _____
Institution: _Jackson C.I._

| TO: (Check One) | ☐ Warden | ☐ Classification | ☐ Medical | ☐ Dental |
|---|---|---|---|---|
| | ☐ Asst. Warden | ☐ Security | ☑ Mental Health | ☐ Other ____ |

| FROM: | Inmate Name | DC Number | Quarters | Job Assignment | Date |
|---|---|---|---|---|---|
| | Johnson, Robert | L 10847 | Y2-127 L | U/A | 06/25/2019 |

**REQUEST**                           Check here if this is an informal grievance ☐

I would like to sign up for psychological counseling because I am emotionally distressed!

All requests will be handled in one of the following ways: 1) Written Information or   2) Personal Interview.  All informal grievances will be responded to in writing.

---

**DO NOT WRITE BELOW THIS LINE**

**RECEIVED**

**RESPONSE**                                    DATE RECEIVED: JUL 0? 2019

PSYCHOLOGY DEPARTMENT
JACKSON C.I.

You will be placed on callout to discuss your issues. $5.00 co pay will apply.

[The following pertains to informal grievances only:]

Based on the above information, your grievance is _____. (Returned, Denied, or Approved).  If your informal grievance is denied, you have the right to submit a formal grievance in accordance with Chapter 33-103.006, F.A.C.

Official (Signature): T. Be____     T. Blackshear- Mental Health     Date: 7/1/19
                                    Jackson CI

Original: Inmate (plus one copy)
CC: Retained by official responding or if the response is to an informal grievance then forward to be placed in inmate's file

This form is also used to file informal grievances in accordance with Rule 33-103.005, Florida Administrative Code.

Informal Grievances and Inmate Requests will be responded to within 10 days, following receipt by the appropriate person.
You may obtain further administrative review of your complaint by obtaining form DC1-303, Request for Administrative Remedy or Appeal, completing the form as required by Rule 33-103.006, F.A.C., attaching a copy of your informal grievance and response, and forwarding your complaint to the warden or assistant warden no later than 15 days after the grievance is responded to.  If the 15th day falls on a weekend or holiday, the due date shall be the next regular work day.

DC6-236 (Effective )

Incorporated by Reference in Rule 33-103.019, F.A.C.

**INMATE REQUEST**

**STATE OF FLORIDA**
**DEPARTMENT OF CORRECTIONS**

Mail Number: _____
Team Number: _____
Institution: _Jackson C.I._

| TO: (Check One) | ☐ Warden ☐ Asst. Warden | ☐ Classification ☐ Security | ☐ Medical ☑ Mental Health | ☐ Dental ☐ Other |
|---|---|---|---|---|

| FROM: | Inmate Name _Johnson, Robert_ | DC Number _L10847_ | Quarters _H1-116L_ | Job Assignment _U/A_ | Date _10/06/2019_ |
|---|---|---|---|---|---|

**REQUEST**                                    Check here if this is an informal grievance ☐

I would like to schedule a psychological callout because I am emotionally distressed & am in need of psychotherapy.

All requests will be handled in one of the following ways: 1) Written Information or  2) Personal Interview.  All informal grievances will be responded to in writing.

Inmate (Signature): _Robt Johnson_               DC#: _L10847_

**DO NOT WRITE BELOW THIS LINE**

RECEIVED

**RESPONSE**                    DATE RECEIVED OCT 08 2019

PSYCHOLOGY DEPARTMENT
JACKSON C.I.

You will be placed on callout.

$5.00 copay will apply.

[The following pertains to informal grievances only:]

Based on the above information, your grievance is _____. (Returned, Denied, or Approved).  If your informal grievance is denied, you have the right to submit a formal grievance in accordance with Chapter 33-103.006, F.A.C.

| Official (Print Name): T. Blu— | Official (Signature): T. Blackshear- Mental Health Jackson CI | Date: 10/10/19 |
|---|---|---|

Original: Inmate (plus one copy)
CC: Retained by official responding or if the response is to an informal grievance then forward to be placed in inmate's file
This form is also used to file informal grievances in accordance with Rule 33-103.005, Florida Administrative Code.

Informal Grievances and Inmate Requests will be responded to within 15 days, following receipt by staff.
You may obtain further administrative review of your complaint by obtaining form DC1-303, Request for Administrative Remedy or Appeal, completing the form as required by Rule 33-103.006, F.A.C., attaching a copy of your informal grievance and response, and forwarding your complaint to the warden or assistant warden no later than 15 days after the grievance is responded to.  If the 15th day falls on a weekend or holiday, the due date shall be the next regular work day.

DC6-236 (Effective 11/18)

Incorporated by Reference in Rule 33-103.005, F.A.C.

83

**STATE OF FLORIDA**
**DEPARTMENT OF CORRECTIONS**

**INMATE REQUEST**

Mail Number: _____
Team Number: _____
Institution: _Jackson C.I._

| TO:<br>(Check One) | ☐ Warden<br>☐ Asst. Warden | ☐ Classification<br>☐ Security | ☐ Medical<br>☑ Mental Health | ☐ Dental<br>☐ Other _____ |
|---|---|---|---|---|

| FROM: | Inmate Name<br>_Johnson, Robert_ | DC Number<br>_L 10847_ | Quarters<br>_Y2-109 U_ | Job Assignment<br>_U/A_ | Date<br>_01/13/2020_ |
|---|---|---|---|---|---|

**REQUEST**                    Check here if this is an informal grievance ☐

_I am submitting this request because I am emotionally distressed_
_& in need of psychological counseling._

All requests will be handled in one of the following ways: 1) Written Information or   2) Personal Interview.  All informal grievances will be responded to in writing.

Inmate (Signature): _[signature]_                    DC#: _L10847_

**DO NOT WRITE BELOW THIS LINE**

**RESPONSE**                    DATE RECEIVED: _1/17/20_

_You will be placed on callout, per your request._

_$5.00 copay will apply_

[The following pertains to informal grievances only:]

Based on the above information, your grievance is _____ . (Returned, Denied, or Approved).  If your informal grievance is denied,

you have the right to submit a formal grievance in accordance with Chapter 33-103.006, F.A.C.]

| Official (Print Name):   T. Blackshear- Mental Health<br>Jackson CI | Official (Signature): _T. Blu_ | Date: _1/17/20_ |
|---|---|---|

Original: Inmate (plus one copy)
CC: Retained by official responding or if the response is to an informal grievance then forward to be placed in inmate's file
This form is also used to file informal grievances in accordance with Rule 33-103.005, Florida Administrative Code.

Informal Grievances and Inmate Requests will be responded to within 15 days, following receipt by staff.
You may obtain further administrative review of your complaint by obtaining form DC1-303, Request for Administrative Remedy or Appeal, completing the form as required by Rule 33-103.006, F.A.C., attaching a copy of your informal grievance and response, and forwarding your complaint to the warden or assistant warden no later than 15 days after the grievance is responded to.  If the 15th day falls on a weekend or holiday, the due date shall be the next regular work day.

DC6-236 (Effective 11/18)

Incorporated by Reference in Rule 33-103.005, F.A.C.

EXHIBIT

1 2

FLORIDA DEPARTMENT OF CORRECTIONS
MENTAL HEALTH SCREENING EVALUATION

Page 1 of 2

| | | | |
|---|---|---|---|
| Date: 7/8/19 | Time: 1415 | Mental Health Grade: ☒ S-1 ☐ S-2 ☐ S-3 | Date DC4-663 Consent Completed: 7/8/19 |

Assigned Housing Status: ☒ General Population ☐ AC ☐ DC ☐ PM ☐ CM ☐ Other:_____

☐ Service Planning Interview/Orientation ☒ Inmate Request ☐ Staff Referral ☐ Sex Offender Screening ☐ PREA Evaluation ☐ Post SHOS

☐ AC/DC/PM/CM Evaluation - ☐ 5-DAY ☐ 30-DAY ☐ 90-DAY ☐ Post Use of Force ☐ Other (describe): _____

**SUBJECTIVE:** Chief Complaint/Inmate Statement(s): "I'm emotionally distress ... I'm having problems w/ security — they constantly harassing me ... writing me bogus DRs"

**OBJECTIVE:** Age: 28   TRD: 2044   Crime & Sentence: 30 yrs. Sex Bat / injury not L (x2)

Mental Health Hx Outside of FDC:   ☒ None   ☐ Outpatient Tx   ☐ Psychotropics   ☐ Inpatient Tx   ☐ Suicidality

Mental Health Tx in FDC:   ☒ None   ☒ Outpatient   ☐ Psychotropics   ☐ SHOS   ☐ TCU   ☐ CSU   ☐ CMHTF   Hx of outpt tx

Past Substance Abuse Hx:   ☐ None   ☒ Acknowledged, but no Tx   ☐ Outpatient Tx   ☐ Inpatient Tx

Relevant Medical Hx:   ☒ No Significant Hx   ☐ Other (describe): _____

Trauma Hx affecting mental health:   ☒ No   ☐ Yes (describe): _____

Date of Most Recent DR: 4/18/19   Number of DRs in the past 6 mo: _____   Hx of PREA as PERP 2016 Ø SA Ø PA

Overall Institutional Adjustment:   ☐ Unsatisfactory   ☐ Satisfactory

Comments: _____

**Mental Status:**

**Appearance:**   ☒ Adequately Groomed   ☒ Appropriately Attired   ☐ Disheveled   ☐ Lacking appropriate hygiene

☐ Other (describe): _____

**Behavior:**   ☒ Cooperative   ☒ Calm   ☐ Psychomotor retardation   ☐ Psychomotor agitation   ☐ Hostile   ☐ Tics/tremors   ☐ Tearful

☒ Good eye contact   ☐ Intermittent eye contact   ☐ Poor eye contact   ☐ Other (describe): _____

**Alert:**   ☒ Yes   ☐ No; if No, describe: _____

**Orientation:**   ☒ Person   ☒ Place   ☒ Time   ☒ Situation   If no to any, describe: _____

**Mood:**   ☐ Euthymic/pleasant   ☐ Dysphoric/sad   ☐ Anxious   ☐ Fearful   ☐ Angry   ☐ Irritable   ☐ Elated   ☐ Indifferent

☐ Labile/fluctuating   ☐ Other (describe): _____

**Observed Affect:**   ☐ Appropriate   ☐ Broad   ☐ Constricted   ☐ Blunted   ☐ Flat   ☐ Other (describe): _____

**Perception:**   ☒ Denied Hallucinations w/i past 30 days   ☐ Reported Hallucinations w/i past 30 days; describe below:

Type: ☐ Auditory   ☐ Visual   ☐ Tactile   ☐ Gustatory   ☐ Olfactory

Note frequency , duration, intensity, time of day, etc.: _____

Effect on adaptive functioning (i.e. distressing/non-distressing, etc.): _____

Note nature of hallucinations:   ☐ Command   ☐ Persecutory   ☐ Deprecatory   ☐ Other: _____

Specify content: _____

**Speech:**   ☐ Appropriate   ☐ Loud   ☐ Rapid   ☐ Pressured   ☐ Over-productive   ☐ Soft   ☐ Monotonous

**Thought Processes/Content:**   ☐ Logical   ☐ Coherent   ☐ Goal-directed   ☐ Irrational   ☐ Circumstantial   ☐ Tangential   ☐ Confused

☐ Loose Associations   ☐ Obsessive   ☐ Delusional   ☐ Paranoid   ☐ Other: _____

If delusions are reported describe type and content (i.e. grandiose, paranoid, persecutory, etc.): _____

Inmate Name: Johnson, Robert
DC# L_____
Date of Birth: 8/30/88
Institution: _____   Race/Sex: B/M

DC4-642B (Revised 11/8/17)

This form is not to be amended, revised, or altered without approval of the Chief of Health Services Administration.

FLORIDA DEPARTMENT OF CORRECTIONS
MENTAL HEALTH SCREENING EVALUATION                                    Page 2 of 2

Memory:  ☒ Memory function grossly intact  ☐ Impairment in  ☐ Immediate  ☐ Recent  ☐ Remote

If impaired, describe:

Suicidal/Homicidal Ideation:   Reported thoughts/plans of self-injury/homicide -  ☐ Yes  ☒ Denied

If yes, describe type of ideation, current and within the past 30 days:

Vegetative Functions (based on average for past 72 hrs):   Reported sleep within the past 24 hrs: 3-6   Reported # of meals/day: 2-3

ASSESSMENT:   Explain any discrepancies between current symptoms reported by the patient and what is observed clinically:

If applicable, list medications currently prescribed and describe compliance:   N/A

ICD-10 Code(s) with DSM-5 Diagnosis   NO DX S1

Status of Current and/or New Problems Identified for ISP (Frequency, Intensity, Duration):   N/A

Did the patient participate in the identification of ISP problems?  ☐ Yes  ☐ No  ☒ N/A

Comments: CBT/MI - ENCOURAGED to PRACTICE RELAXATION. Contact PROPERTY in REGARD to legal work.

PLAN:  ☐ No Follow-Up Indicated  ☐ Follow-Up is/or will be scheduled for (date):

☐ Initiate BPSA and/or ISP  ☐ Update BPSA  ☐ Schedule ISP Update/Review  ☐ Update providers  ☐ Continue ISP (as is)

☐ Complete DC4-528, *Mental Status of Confinement Inmate*  ☐ Complete DC4-647, *Sex Offender Screening and Selection*

☐ Complete DC4-529, *Staff Request/Referral*  ☐ Refer to:

☐ Consult With:

☐ Other:

Staff Signature and Stamp:   *T. Blu*   T. Blackshear Mental Health
Jackson CI

Inmate Name
DC#                          Race/Sex
Date of Birth
Institution

DC4-642B (Revised 11/8/17)

This form is not to be amended, revised, or altered without approval of the Chief of Health Services Administration.

87

FLORIDA DEPARTMENT OF COR___IONS
MENTAL HEALTH SCREENING EVALUATION

Page 1 of 2

Date: 7-1-2020  Time: 2:06  Mental Health Grade: ☒ S-1 ☐ S-2 ☐ S-3  Date DC4-663 Consent Completed: 7-1-2020

Assigned Housing Status: ☐ General Population ☐ AC ☐ DC ☐ PM ☒ CM ☐ Other:

☒ Service Planning Interview/Orientation ☐ Inmate Request ☐ Staff Referral ☐ Sex Offender Screening ☐ PREA Evaluation ☐ Post SHOS

☒ AC/DC/PM/CM Evaluation - ☐ 5-DAY ☒ 30-DAY ☐ 90-DAY ☐ Post Use of Force ☒ Other (describe): MHIPO, MHBSR

**SUBJECTIVE:** Chief Complaint/Inmate Statement(s): "I feel emotionally distressed because I am in Prison for nothing and the courts have denied my emotions. My paperwork for my motion is in my legal box." No mental health concerns were identified. 5th incarceration

**OBJECTIVE:** Age: 39  TRD: 05/07/2044  Crime & Sentence: 30 YRS: Sex Bat/Injury x2

Mental Health Hx Outside of FDC:  ☐ None ☒ Outpatient Tx ☐ Psychotropics ☐ Inpatient Tx ☐ Suicidality As a juvenile

Mental Health Tx in FDC:  ☒ None ☐ Outpatient ☐ Psychotropics ☐ SHOS ☐ TCU ☐ CSU ☐ CMHTF

Past Substance Abuse Hx:  ☐ None ☒ Acknowledged, but no Tx ☐ Outpatient Tx ☐ Inpatient Tx Marijuana

Relevant Medical Hx:  ☒ No Significant Hx ☐ Other (describe):

Trauma Hx affecting mental health:  ☒ No ☐ Yes (describe): Mom passed in 2001

Date of Most Recent DR:  03/10/2020  Number of DRs in the past 6 mo:  5

Overall Institutional Adjustment:  ☒ Unsatisfactory ☐ Satisfactory

Comments: CM STATUS

**Mental Status:** Possession of Weapon

Appearance: ☒ Adequately Groomed ☒ Appropriately Attired ☐ Disheveled ☐ Lacking appropriate hygiene
   ☐ Other (describe): N/A

Behavior: ☒ Cooperative ☒ Calm ☐ Psychomotor retardation ☐ Psychomotor agitation ☐ Hostile ☐ Tics/tremors ☐ Tearful
   ☒ Good eye contact ☐ Intermittent eye contact ☐ Poor eye contact ☐ Other (describe): N/A

Alert: ☒ Yes ☐ No; if No, describe: N/A

Orientation: ☒ Person ☒ Place ☒ Time ☒ Situation  If no to any, describe: N/A

Mood: ☒ Euthymic/pleasant ☐ Dysphoric/sad ☐ Anxious ☐ Fearful ☐ Angry ☐ Irritable ☐ Elated ☐ Indifferent
   ☐ Labile/fluctuating ☐ Other (describe): N/A

Observed Affect: ☒ Appropriate ☐ Broad ☐ Constricted ☐ Blunted ☐ Flat ☐ Other (describe): N/A

Perception: ☒ Denied Hallucinations w/i past 30 days ☐ Reported Hallucinations w/i past 30 days; describe below:
   Type: ☐ Auditory ☐ Visual ☐ Tactile ☐ Gustatory ☐ Olfactory
   Note frequency, duration, intensity, time of day, etc.): N/A
   Effect on adaptive functioning (i.e. distressing/non-distressing, etc.): N/A
   Note nature of hallucinations: ☐ Command ☐ Persecutory ☐ Deprecatory ☐ Other: N/A
   Specify content: N/A

Speech: ☒ Appropriate ☐ Loud ☐ Rapid ☐ Pressured ☐ Over-productive ☐ Soft ☐ Monotonous

Thought Processes/Content: ☒ Logical ☒ Coherent ☐ Goal-directed ☐ Irrational ☐ Circumstantial ☐ Tangential ☐ Confused
   ☐ Loose Associations ☐ Obsessive ☐ Delusional ☐ Paranoid ☐ Other: N/A
   If delusions are reported describe type and content (i.e. grandiose, paranoid, persecutory, etc.):

Inmate Name  Johnson, Robert
DC#  L10847  Race/Sex  B / M
Date of Birth  08/30/1980
Institution  Hardee C.I.

DC4-642B (Revised 11/8/17)
This form is not to be amended, revised, or altered without approval of the Chief of Health Services Administration.

88

**FLORIDA DEPARTMENT OF CORRECTIONS**
**MENTAL HEALTH SCREENING EVALUATION**                  Page 2 of 2

**Memory:** ☑ Memory function grossly intact ☐ Impairment in ☐ Immediate ☐ Recent ☐ Remote
If impaired, describe:

**Suicidal/Homicidal Ideation:** Reported thoughts/plans of self-injury/homicide - ☐ Yes ☑ Denied
If yes, describe type of ideation, current and within the past 30 days:

**Vegetative Functions (based on average for past 72 hrs):** Reported sleep within the past 24 hrs: _8 - 10_ Reported # of meals/day: _3_
**ASSESSMENT:** Explain any discrepancies between current symptoms reported by the patient and what is observed clinically: _Patient did not exhibit behaviors evident of acute mental health distress. New arrival orientation completed._

If applicable, list medications currently prescribed and describe compliance: _N/A_

**ICD-10 Code(s) with DSM-5 Diagnosis** _N/A_ _S I_

Status of Current and/or New Problems Identified for ISP (Frequency, Intensity, Duration): _N/A_

Did the patient participate in the identification of ISP problems? ☐ Yes ☐ No ☐ N/A _Certified Electrician_
Comments: _Hope for future - Get out of prison, take care of family, have successful career. Support Network - Mother. Coping Strategies - Write, read, exercise, occasional sex._

**PLAN:** ☐ No Follow-Up Indicated ☑ Follow-Up is/or will be scheduled for (date): **90 DAYS**
☐ Initiate BPSA and/or ISP ☐ Update BPSA ☐ Schedule ISP Update/Review ☐ Update providers ☐ Continue ISP (as is)
☑ Complete DC4-528, *Mental Status of Confinement Inmate* ☐ Complete DC4-647, *Sex Offender Screening and Selection*
☐ Complete DC4-529, *Staff Request/Referral* ☐ Refer to: _____
☐ Consult With: _____
☑ Other: **WEEKLY CM ROUNDS**

Staff Signature and Stamp:                       R. Evans, MHP, LMHC
                                       Hardee C.I.
_R. Evans, LMHC-MHP_

Inmate Name _Johnson, Robert_
DC# _L10847_ Race/Sex _B / M_
Date of Birth _08/30/1980_
Institution _Hardee C.I._

DC4-642B (Revised 11/8/17)
This form is not to be amended, revised, or altered without approval of the Chief of Health Services Administration.

89

FLORIDA DEPARTMENT OF CORRECTIONS
MENTAL HEALTH EMERGENCY EVALUATION                                    page        of

| Date/Time | 4-3-20 (1130) 1145- 1205 |

**SUBJECTIVE:**
Reason for encounter; who referred inmate and why, i.e., inmate's behavior or concern.

S: SUBJECTIVE: (Reason for encounter: Who referred I/M and why – I/M's behavior or concern)
Inmate is upset because he is getting DR for lying under a blanket and the Corona virus may because entimity death trip. Upset about the blanket because he received a DR for lying under his 2nd blanket.

**OBJECTIVE:**
Identifying Data/Relevant History: Age, R/S, Crime, Sentence, Past Psych Hx, Self-Harm /Suicide Drug Use Hx, Medical Hx, Tx in DC, Institutional adjustment.
Mental Status: Appearance, Behavior, Orientation, Memory, Thinking, Perception, Mood, Affect, S/H ideation, Vegetative functions; Presence or absence of desire/intent to self-injure or commit suicide; Presence/absence of suicide/self-injure plan; Presence/absence of Distressing personal or situational factors. Degree of interest in and hope for the future.

O: OBJECTIVE: "I just want it documented"
Identifying Data/Relevant Hx:
39 - B/M - 20 yrs - Sex Batt. / injury (x2)
Past Psych.Hx: none reported
Suicide Hx: none reported
Drug Use Hx: ock. no Tx
Medical Hx: See med file
MH Tx in DC: S-1
Institutional Adjustment: Poor - in confinement
MENTAL STATUS:
Appearance: attire
Behavior: agitated
Orientation: x3
Memory: intact
Thinking: goal oriented
Perception: no distortions
Mood/Affect: irritable
S/H Ideation: Denied
Vegetative Functions (Appetite/Sleep): 6 hr.
PRESENCE OR ABSENCE OF:
Desire/intent to self-injure or commit suicide: Denied
Suicide/self-injury plan: none stated
Distressing personal/situational factors: received Wrongful DR
Degree of interest in/hope for the future: Strong

**ASSESSMENT:**
Determine following: 1. No significant mental impairment; 2. Presence of mild to moderate mental impairment (describe) that may be managed on outpatient basis; 3. Presence of acute symptoms (describe) which cannot be safely managed on outpatient basis; 4. Risk of suicide or serious self-injurious behavior.
Diagnostic Impression: ICD-10 Diagnosis (at least Provisional is mandatory.).

A: ASSESSMENT:
[ ] YES [✓] NO: 1. Significant mental impairment?
[✓] YES [ ] NO: 2. Presence of mild to moderate mental impairment (describe) that may be managed on outpatient basis?
[ ] YES [✓] NO: 3. Presence of acute symptoms (describe) which cannot be safely managed on outpatient basis?
[ ] YES [✓] NO: 4. Risk of suicide or serious self-injurious behavior?
DIAGNOSTIC IMPRESSION (AT LEAST A PROVISIONAL DIAGNOSIS IS MANDATORY):
ICD-10 Mental Health Diagnosis: S-1
ICD-10 Other Relevant Conditions:

**PLAN:**
Indicate whether crisis intervention or other counseling was provided and its relative effectiveness; whether Infirmary MH Care is recommended; whether SHOS (Self-Harm Observation Status) is recommended; date of next scheduled follow-up.

P: PLAN:
[✓] YES [ ] NO: 1. Was crisis intervention counseling provided? Supportive - encouraging
[✓] YES [ ] NO: 2. Was the intervention above relatively effective? How? Thanked for talking to him
[ ] YES [✓] NO: 3. Is infirmary MH care recommended?
[ ] YES [✓] NO: 4. Is SHOS recommended?
Released to Security. Stable

**Staff Signature and Stamp:**

DATE OF NEXT SCHEDULED FOLLOW-UP: No follow-up - informed he can write
request if he wants to talk

T. Hall, MHP
Mental Health Professional

Inmate Name: Johnson Robert
DC#: L10847                    Race/Sex: B/m
Date of Birth: 8-20-80
Institution: Jackson CI

This form is not to be amended, revised, or altered
without approval by the Director of Health
Services Administration

MENTAL HEALTH EMERGENCY EVALUATION
DC4-642G (Revised 10/3/14)

EXHIBIT

13

STATE OF FLORIDA—DEPARTMENT OF CORRECTIONS
MENTAL HEALTH EMERGENCY EVALUATION                              page  1  of  1

| Date/Time 5/17/18 | NOTIFIED BY OFF THOMPSON 1100. SEEN 1130 |
|---|---|
| **SUBJECTIVE:** Reason for encounter; who referred inmate and why, i.e., inmate's behavior or concern. | S: SUBJECTIVE: (Reason for encounter: who referred I/M and why -- I/m's behavior or concern): "I FEEL LIKE PEOPLE ARE TRYING TO KILL ME. SGT PAUL AND RESTER SAID THEY WERE GONNA HAVE GANG MEMBERS KILL ME. SOME OF THE GANG MEMBERS FROM THE "CUT THROATS" THAT STABBED ME AT ANOTHER CAMP HAVE THREATENED ME HERE. I HAVE A CASE AGAINST DOC GOING ON NOW." |
| **OBJECTIVE:** Identifying Data/Relevant History: Age, R/S, Crime, Sentence, Past Psych Hx, Suicide and Drug Use Hx, Medical Hx, Tx in DC, Institutional adjustment. Mental Status: Appearance, Behavior, Orientation, Memory, Thinking, Perception Mood, Affect, S/H ideation, Vegetative functions; Presence or absence of desire/intent to self-injure or commit suicide; Presence/absence of suicide/self-injure plan; Presence/absence of Distressing personal or situational factors. Degree of interest in and hope for the future. | O: OBJECTIVE: *WHILE PT WAS WAITING TO SPEAK WITH OIC IN HOLDING CELL FOLLOWING SESSION, HE COVERED THE CELL WINDOW WITH TOILET PAPER WHICH HE REMOVED WHEN REQUESTED, STATING APPLIED IT BECAUSE HE WAS DEFECATING.* I/M is a DOB 8/30/80 year old B male serving 30 YEARS FOR SEX BAT/INJURY NOT L (2) ENTER DC : 11/7/05 TRD : 12/8/24 Psych History: NONE  Suicide History: NONE  Drug History:  ACKNOWLEDGED, NO TX Medical History:  _SEE MEDICAL RECORDS TX in DC: NONE Institutional Adjustment: UNSATISFACTORY, 2 DR'S IN PAST 6 MONTHS MSE: APPROPRIATELY ATTIRED AND ADEQUATELY GROOMED Behavior: CALM, COOPERATIVE Orientation:  ALERT,  Ox4 Memory:  Immediate, recent and remote: INTACT_____ Thinking:  COHERENT Perception:  FREE OF DELUSIONS/HALLUCINATIONS Mood/Affect: PLEASANT WITH CONGRUENT AFFECT S/H ideation/Intent/Plan: NONE Vegetative Functions (appetite/sleep):  8 /24 hours sleep and _3_ /3 meals. PRESENCE OR ABSENCE OF: Distressing personal/ situational factors:  THREATS FROM STAFF & OTHER IM'S Degree of interest in/ hope for future:  WINNING LAWSUIT AGAINST DOC |
| **ASSESSMENT:** Determine following: 1. No significant mental impairment; 2. Presence of mild to moderate mental impairment (describe) that may be managed on outpatient basis; 3. Presence of acute symptoms (describe) which cannot be safely managed on outpatient basis; 4. Risk of suicide or serious self-injurious behavior. Diagnostic Impression: ICD-10 Diagnosis (at least Provisional is mandatory) | A: ASSESSMENT: [ ] YES  [x ] NO 1. Significant mental impairment? [ ] YES  [X ] NO 2. Presence of mild to moderate mental impairment (describe) that may be managed on outpatient basis? [ ] YES  [X ] NO 3. Presence of acute symptoms (describe) which cannot be safely managed on outpatient basis? ____ [ ] YES  [X] NO 4. Risk of suicide or serious self injurious behavior? DIAGNOSTIC IMPRESSION : _NO DX, S1 [X ] YES  [ ] NO  1. Was crisis intervention counseling provided? [ X] YES  [ ] NO  2. Was the intervention above relatively effective?  How? ASSITING IN PLAN OF ACTION TO ADDRESS ISSUE WITH SECURITY. PT AGREED TO SPEAK WITH OIC WHO WAS INFORMED. [ ] YES  [X ] NO 3. Is infirmary MH care recommended? |
| **PLAN:** Indicate whether crisis intervention or other counseling was provided and its relative effectiveness; whether Infirmary MH Care is recommended; whether SHOS (Self-Harm Observation Status) is recommended; date of next scheduled follow-up. | [ ] YES  [X ] NO 4. IS SHOS recommended? DATE OF NEXT SCHEDULED FOLLOW-UP: NONE |
| **Staff Signature and Stamp:** | L. Coetzee, MHP Franklin CI Centurion |

Johnson, Robert
DC# L10847
black / male
DOB: 08 / 30 / 1980
FRANKLIN CI

MENTAL HEALTH EMERGENCY EVALUATION
DC4-642G (Revised 10/3/14)

This form is not to be amended, revised, or altered without approval of the Deputy Assistant Secretary of Health Services Administration

EXHIBIT

14

# FLORIDA DEPARTMENT OF CORRECTIONS
## CONSULTATION REQUEST/CONSULTANT'S REPORT

| Type of Service: Opt | FROM Institution: Franklin CI | DATE OF REQUEST: 7/12/18 |
|---|---|---|
| Reason(s) for consultation:<br>Evaluate and recommend diagnostic plan_____<br>Evaluate and recommend treatment plan_____<br>Other (specify):_____ | Acuity of consultation:<br>Emergency_____<br>Urgent ✗/<br>Routine ✗ | DATE APPOINTMENT MADE:<br>7/9/18<br>Staff Signature:<br>M. Crumbley, RN |
| Visit Type - Initial ☒ Follow-up ☐<br>Follow-up consults require justification<br>*Optometry/Ophthalmology – attach DC4-702A | | APPOINTMENT DATE:<br>8/9/18 |

Condition is (check one): ☒ Acute Trauma    ☒ Acute Illness    ☐ Chronic

History of present illness (include onset, presentation, progress, therapy):

Physical findings:

(R) eye 20/200    (L) eye 20/200

Diagnostic findings (explain laboratory, x-ray, or other test findings):

Other pertinent information:

Provisional diagnosis: VISUAL DISTURBANCES

Health Care Provider Signature/Stamp:_____ C Pagan, MD Franklin CI Centurion

CHO/Designee Approval Signature/Stamp:_____

## AUTHORIZATION FOR SPECIALTY EVALUATION

I, the undersigned, have had explained to me and understand that I require _____
which cannot be accomplished at _____
I also understand that should hospitalization and/or surgery be necessary, a separate consent form will be signed prior to such hospitalization and/or surgery. I therefore consent to be referred to a reception and medical center, or such other health care facility as may be appropriate for the reason(s) stated, and consent to undergo health care services as may be necessary to evaluate my health status.

H. Rush, LPN
Franklin CI
Centurion

Signature of Patient: Robert Johnson    Date: 7/25/18

Signature of Witness: HRushLPN    Date: 7-25-18

## IT IS ABSOLUTELY NECESSARY THAT INMATES ARE NOT MADE AWARE OF ANY SCHEDULING INFORMATION PENDING ANY APPOINTMENT OUTSIDE THE INSTITUTION

Inmate Name Johnson, Robert
DC# L10847    Race/Sex B/M
Date of Birth 8/30/82
EOS DATE: _____

DC4-702 (Revised 2/23/18) Page 1 of 2

This form is not to be amended, revised, or altered without approval of the Chief of Health Services Administration.

## INMATE REQUEST

**STATE OF FLORIDA**
**DEPARTMENT OF CORRECTIONS**

Mail Number: _____
Team Number: _____
Institution: _Jackson C.I._

| TO: (Check One) | ☐ Warden ☐ Asst. Warden | ☐ Classification ☐ Security | _Optometrist Ms. Jackson_ ☑ Medical ☐ Mental Health | ☐ Dental ☐ Other |
|---|---|---|---|---|

| FROM: | Inmate Name _Johnson, Robert_ | DC Number _L-10847_ | Quarters _F4-109U_ | Job Assignment _H/M_ | Date _10/09/2018_ |
|---|---|---|---|---|---|

**REQUEST**    Check here if this is an informal grievance ☐

I am submitting you this request because I received a pair of prescription eyeglasses on Oct. 08 & I would like to have tints placed over the lenses due to the fact that extreme lighting settings & sun rays agitate my eyes & cause me to have headaches while wearing my eyeglasses. Thanks in advance

All requests will be handled in one of the following ways: 1) Written Information or 2) Personal Interview. All informal grievances will be responded to in writing.

Inmate (Signature): _____    DC#: _L10847_

RECEIVED
OCT 12 2018

DO NOT WRITE BELOW THIS LINE

## RESPONSE

DATE RECEIVED: Health Services Jackson CI

This Matter is being handled.

Watch For Call Out

[The following pertains to informal grievances only:]

Based on the above information, your grievance is _____. (Returned, Denied, or Approved). If your informal grievance is denied, you have the right to submit a formal grievance in accordance with Chapter 33-103.006, F.A.C.]

| Official (Print Name) K. Jackson, AA | Official (Signature): | Date: 10/15/18 |
|---|---|---|

Original: Inmate (plus one copy)
CC: Retained by official responding or if the response is to an informal grievance then forward to be placed in inmate's file
This form is also used to file informal grievances in accordance with Rule 33-103.005, Florida Administrative Code.

Informal Grievances and Inmate Requests will be responded to within 10 days, following receipt by staff.
You may obtain further administrative review of your complaint by obtaining form DCI-303, Request for Administrative Remedy or Appeal, completing the form as required by Rule 33-103.006, F.A.C., attaching a copy of your informal grievance and response, and forwarding your complaint to the warden or assistant warden no later than 15 days after the grievance is responded to. If the 15th day falls on a weekend or holiday, the due date shall be the next regular work day.

DC6-236 (Effective 12/14)

Incorporated by Reference in Rule 33-103.005, F.A.C.

(95)

Robert Johnson   FDOC No.  L 10847
Hardee Correctional   Institution
6901  SR   62
Bowling Green, FL   33834



Tampa/St. Pete FL 336
TUE 28 SEP 2021  PM

Martin A. Fitzpatrick , United Sta
Magistrate  Judge
United States District Court
Northern District of Florida
111  North Adams Street
Tallahassee, FL   32301 - 7717

